# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Norfolk Division)

| | |
|---|---|
| ZP No. 332, LLC, | ) |
|     Plaintiff/Counter-Defendant, | ) |
| v. | ) Case No. 2:24-cv-611-JKW-DEM |
| HUFFMAN CONTRACTORS, INC., | ) |
|     Defendant, | ) |
| and | ) |
| TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, | ) |
|     Defendant/Counter-Plaintiff/Third-Party Plaintiff, | ) |
| v. | ) |
| ATLANTIC UNION BANK, | ) |
|     Third-Party Defendant. | ) |

**AMENDED COMPLAINT**

Pursuant to Federal Rules of Civil Procedure 15(a) and 15(d), Plaintiff ZP No. 332, LLC ("Plaintiff" or "ZP") files this Amended Complaint against Defendant Huffman Contractors, Inc. ("Huffman") and Defendant/Counter-Plaintiff/Third-Party Plaintiff Travelers Casualty and Surety Company of America ("Travelers"), and alleges as follows:

**INTRODUCTION**

1. This action arises out of Defendant Huffman's deficient work as the general contractor on a multifamily residential project located in Norfolk, Virginia, and the years-long delays, repairs, and financial losses caused by those deficiencies. This action also arises out of Travelers' failure to

properly and timely undertake to complete the Project, which was plagued by Travelers' negligent selection of Perini as the replacement contractor, and, more recently, Travelers' misrepresentations to ZP and the City of Norfolk in an effort to obtain a certificate of occupancy and artificially "close out" the Project under false pretenses. All told, these issues have caused ZP to suffer financial losses exceeding tens of millions of dollars relating to the Project.

2. ZP is the owner and developer of a multifamily apartment complex project known as The Port at East Beach (formerly known as The Oasis Apartments and Yacht Club) located at 4621A & 462113 Pretty Lake Avenue, Norfolk, Virginia 23518 (the "Project").

3. As set forth in greater detail below, Defendant Huffman failed to perform its work in accordance with its construction contract on the Project, resulting in defective and incomplete work that had to be completed or corrected. In addition, Huffman failed to perform its work on the Project in a timely manner, resulting in substantial damages to ZP.

4. Ultimately, Defendant Huffman failed to complete or correct its work on the Project, and was terminated for cause.

5. Travelers then undertook to correct and complete the work using Perini as the new general contractor.

6. But Travelers failed to perform its obligations in a prompt and diligent manner, failed to exercise reasonable care in selecting and utilizing Perini as the completion contractor throughout its involvement in the Project, and has failed to reimburse ZP for costs and damages incurred on the Project and due under the construction contract and the performance bond.

## PARTIES, JURISDICTION & VENUE

7. Plaintiff is a limited liability company organized and existing under the laws of the State of Virginia with its principal place of business in Wilmington, North Carolina. Plaintiff's members include Ocean Park Properties, LLC ("Ocean Park") and eight trusts (the "Zimmer Family

2

Trusts"), including (1) the William R. Zimmer Children's GST Irrevocable Trust One f/b/o Jeffrey L. Zimmer; (2) William R. Zimmer Children's GST Irrevocable Trust Two f/b/o Herbert J. Zimmer; (3) William R. Zimmer Children's GST Irrevocable Trust Three f/b/o Alan M. Zimmer; (4) William R. Zimmer Children's GST Irrevocable Trust Four f/b/o Arlene Z. Schreiber; (5) Jeffrey L. Zimmer Revocable Trust u/a/d 10/09/2013; (6) Herbert J. Zimmer Children's GST Investment Trust u/a/d 06/30/1997; (7) Alan M. Zimmer Children's GST Investment Trust u/a/d 06/30/1997; and (8) Arlene Z. Schreiber Children's GST Investment Trust u/a/d 06/30/1997. Ocean Park is a North Carolina limited liability company owned by Heather Loesch, a citizen and resident of New Hanover County, North Carolina. The Zimmer Family Trusts are North Carolina trusts whose trustees are all residents and citizens of North Carolina. ZP is a citizen of North Carolina for purposes of diversity jurisdiction.

8. Defendant Huffman is, upon information and belief, a corporation organized and existing under the laws of the State of Arkansas with its principal place of business in Little Rock, Arkansas.

9. Defendant Travelers is, upon information and belief, a corporation organized and existing under the laws of the State of Connecticut with its principal place of business in Hartford. Connecticut.

10. This Court has subject matter jurisdiction in this case pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000, exclusive of interest and costs, and the action is between citizens of different states. The Court also has personal jurisdiction because Huffman and Travelers have both submitted to the jurisdiction of the Court, and because Huffman and Travelers have sufficient minimum contacts with the Commonwealth of Virginia and have purposefully availed themselves of the privilege of conducting business in Virginia by, among other things, entering into contracts for the construction and bonding of the Project, and undertaking to construct and complete the Project. This action arises out of and relates to Huffman's and Travelers' contacts with Virginia.

11. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to ZP's claims occurred in this district, and because the property at issue is situated in this district.

12. Any and all conditions precedent to ZP pursuing these claims have been met, satisfied, or waived by Defendants Huffman and Travelers.

## BACKGROUND FACTS

### A. The Construction Contract and Performance Bond

13. In or around April 2021, ZP entered into a contract with Huffman to serve as the general contractor on the Project (the "Contract" or "Construction Contract"). A true and correct copy of the Contract is attached hereto as **Exhibit A.**

14. The Contract had a guaranteed maximum price of $31,272,000, and a substantial completion date of December 6, 2022.

15. The Contract required Huffman to procure payment and performance bonds in connection with the Project.

16. On or about April 13, 2021, Defendants Travelers and Huffman executed and issued to ZP performance and payment bonds generally guaranteeing Huffman's performance of the Contract and payment of subcontractors and suppliers providing services or materials to the Project. True and correct copies of the Bonds are attached hereto as **Exhibit B**. The primary bond at issue in this action is the performance bond and hereinafter all references to the performance bond issued by Defendants Huffman and Travelers shall be simply the "Bond".

### B. Huffman Falls Behind Schedule and Fails to Timely Correct the Work.

17. During the fall of 2021 and through the spring of 2022, the senior management of Huffman changed, project management changed, and the construction personnel that had historically worked with the Plaintiff and its related development companies were no longer involved on a regular

4

basis. Upon information and belief, Huffman also failed to exercise reasonable care and diligence in hiring and supervising its employees on the Project, including by hiring and utilizing superintendents who were unqualified and unfocused on their work and responsibilities, and Huffman had to fire a number of superintendents during the course of construction as a result.

18. By the summer of 2022, Huffman's work on the Project fell behind schedule, and ZP demanded that Huffman begin recovering lost schedule time.

19. In addition, in the summer of 2022, some defects in the work installed by Huffman began appearing. ZP hired consultants to identify and list work items in the field that needed correction, and then had those consultants monitor corrective work.

20. While Huffman corrected some of the defects identified by ZP and its consultants, Huffman struggled to repair the defects at a sufficient pace to avoid further delay on the Project. In addition, despite repeated demands by ZP to improve the schedule, other areas of the work continued to fall behind schedule.

21. For example, Huffman's defective work, including work performed on its behalf by subcontractors, included improper construction of the building envelope weather barrier, roofing, siding, structural framing, and floor and roof truss assemblies. This resulted in sections of the building being exposed to water intrusion and leaks that damaged surrounding building framing and sheathing components, damaged roofing materials and insulation, required removing and replacing mechanical, electrical, and plumbing equipment impacted by the improper framing work and damage, wholesale removal and correction of building cladding sections, and corresponding project delays.

**C. ZP Terminates Huffman and Looks to Travelers to Complete the Project.**

22. On December 6, 2022, ZP issued written notice of its intent to terminate the Contract unless Huffman began diligently curing its default. The notice was copied to Travelers in accordance

with the Contract and the Bond. A true and correct copy of the December 6, 2022 notice of intent to terminate is attached hereto as **Exhibit C**.

23. On December 20, 2022, ZP and Defendants Huffman and Travelers held a conference call pursuant to Section 3 of the Bond, as requested by Travelers.

24. As Huffman undertook no measures of any kind whatsoever to improve its Contract performance or to diligently commence curing its default after receipt of notice of intent to terminate, ZP formally terminated Huffman on December 20, 2022 and called on Travelers to perform its obligations under the Bond. A true and correct copy of the December 20, 2022 notice of termination is attached hereto as **Exhibit D**.

25. Travelers then agreed to undertake to perform and complete the Contract through its agents or independent contractors.

26. Travelers selected and retained Perini Management Services, Inc. ("Perini") to act as the completing contractor, while also insisting that Travelers act as the "contractor" with ZP, with all communications flowing through Travelers.

27. In order to monitor and protect the Project property, and have minor work continue on the Project, ZP retained a separate contractor, Morgan Keller, Inc., to oversee the continued repair of some framing deficiencies, site work, and otherwise guard the integrity and security of the Project site in the hopefully brief interim period leading up to Travelers completing the Project.

**D.  Travelers and Its Selected Contractor Take Months to Take Over the Project.**

28. However, Travelers' takeover of the Project was inordinately slow. It was not until mid-April 2023 that Travelers had Perini ready to commence operations at the Project, and even at that point, Perini was not in a position to actually perform any work on the Project.

29. In April 2023, a Takeover Agreement was entered into between ZP and Travelers that would generally govern the process of Travelers completing the work at the Project, and that also

identified open claims between ZP and Travelers. A true and correct copy of the Takeover Agreement is attached hereto as **Exhibit E**.

30. Substantial activity at the Project, other than trash removal and site security and safety work, did not commence in earnest by Travelers until sometime in June 2023, six (6) months after Huffman's termination.

31. Unfortunately, not only did the start of Travelers' completion take many months, the progress of the work in the early months of Travelers undertaking to complete the Project was slow as well. Remarkably, Travelers and Perini provided ZP with a schedule claiming that it would take eighteen (18) months to complete the Project, which was slightly less time than the original schedule for building the entire Project from scratch.

32. Travelers and Perini originally insisted that completing the second half of the Project would take almost as long as the original Project schedule for the entire Project, and did not waver from that position until the early summer of 2024, when Travelers agreed to try to obtain occupancy on one of the two Project buildings by the end of August 2024.

E. **Travelers and Its Selected Contractor Exacerbate the Delays.**

33. Throughout the course of Travelers' involvement in the Project, it was apparent that Travelers' selected contractor, Perini, and the project managers and personnel used by Perini, were inexperienced and unqualified in the type of work and locality of the Project, generally incompetent, or both. These issues were or should have been known to Travelers. Indeed, Perini's own website reflects that it has little to no experience serving as a takeover contractor on residential construction projects remotely similar to the Project at issue in this case, and does not list any projects, residential or otherwise, located in Virginia whatsoever. Moreover, the only two residential projects listed on Perini's website as of the date of this filing are outside the continental United States and classified as governmental/public housing projects, vastly different from the Project at issue here. One of the two

projects involved construction of 10 two-story duplex units, as compared to the Project's five-story 148 multi-family units and 257-space parking deck, and the second project involved renovations of existing buildings, not the construction of those buildings. Upon information and belief, Perini had to hire project managers and other personnel specifically to work on the Norfolk Project, and even those individuals lacked adequate experience and qualifications. Perini's original project manager, for example, had no prior takeover experience, and its original superintendent had no prior framing experience. While ZP and Huffman each identified and proposed specific contractors to complete the work, including ZP's interim contractor, Morgan Keller, Travelers decided to retain Perini.

34. In addition, Travelers and Perini performed deficient work, including deficient work that damaged work installed by other contractors, and continuously asserted claims for change orders for matters covered by the scope of the original Contract in order to improperly limit Traveler's loss on the Project, which further distracted personnel from the process of completing the Project in a timely manner, and exacerbated the delays in completing the Project.

35. As a result of Huffman's and Travelers' deficient work and delays, the Project still has not achieved final completion as of the date of this filing—*over two years* after the originally agreed-upon December 6, 2022 completion date.

36. Predictably, this has caused (and continues to cause) ZP to suffer significant financial losses, including, but not limited to, additional construction loan interest, loss of rent, and losses in value of the property, which, given the nature of the Project and their involvement, Huffman and Travelers would have contemplated at the time they entered into the Contract and Bond, and when undertaking to correct and complete the work.

F.  **Travelers Requests a Certificate of Occupancy Knowing Some Units Could Not Be Fully and Safely Occupied, and Misrepresents the Condition of the Property to Artificially "Close Out" the Project.**

37. Finally, on November 14, 2024, Travelers provided ZP with its "Occupancy Notice" representing that the units would be delivered for occupancy by tenants by January 13, 2025 (while also making various self-serving comments about the purported cause of certain delays). A true and correct copy of the Occupancy Notice is attached as **Exhibit F**.

38. But Travelers did not deliver final occupancy of the units as promised, triggering ZP's right under Exhibit J of the Contract to recover additional liquidated damages (and other recoverable damages) for the additional delays caused, in whole or in part, by Travelers.

39. Specifically, in emails dated January 7, 2025 and January 10, 2025, Travelers' Senior Claim Counsel, Francis A. Camarota, informed ZP that Travelers would not achieve substantial and final occupancy by January 13, 2025.

40. Mr. Camarota's emails, inappropriately sent to a represented party without notifying counsel, claimed that building officials were "refusing" to perform necessary inspections to obtain occupancy certificates and failing to "cooperate" with Travelers. Upon information and belief, these characterizations were false or misleading when made.

41. On January 14, 2025, counsel for ZP sent correspondence to Mr. Camarota addressing these emails, explained that Travelers had breached its obligations by failing to deliver the units consistent with the Occupancy Notice, and reserved the right to seek additional resulting damages, including additional liquidated and/or delay damages. A true and correct copy of the January 14, 2025 letter is attached as **Exhibit G**.

42. Ultimately, Travelers was able to schedule the inspections with the City of Norfolk. While numerous items remained incomplete on the Project, certain issues were more serious than others. For example, ZP discovered that several units were still missing electrical breakers for the

9

air-handling units, rendering those units uninhabitable. Upon information and belief, Travelers knew about this issue prior to requesting an inspection for purposes of obtaining a temporary certificate of occupancy ("TCO") for the units.

43. But Travelers pressed forward with the TCO inspection anyway. Upon information and belief, electrical breakers were moved around by Perini during the inspection in order to obtain approval for a TCO for all of the units in Building 1 on the Project.

44. On January 17, 2025, Perini's project manager, Stephen McCullough, sent an email to ZP attaching a field inspection approval form. Mr. McCullough acknowledged that the document was "being submitted to the City of Norfolk to issue the official TCO paperwork." A true and correct copy of Mr. McCullough's January 17, 2025 email and attachment are attached hereto as **Exhibit H**.

45. In submitting the January 17, 2025 approval request, Travelers and Perini recognized that TCOs may be issued before completion of the work only if "such portion or portions of a building or structure may be occupied safely prior to full completion of the building or structure without endangering life or public safety." *See* Ex. H.

46. Thus, Travelers and Perini represented that all units could be occupied safely without endangering life or public safety as of January 17, 2025. Given the missing electrical breakers and inoperable HVAC systems in several units (among other things), that was simply false.

47. Nonetheless, on January 17, 2025, the City of Norfolk issued a temporary certificate of use and occupancy, excluding "exterior common / pool area, [and] exterior stairs by elevator 12." A true and correct copy of the January 17, 2025 TCO is attached as **Exhibit I**.

48. That same day, Mr. Camarota sent email correspondence to ZP claiming that the TCO "allows for full occupancy" of the building, and that it was Travelers' "understanding that residents may begin moving into Building 1 immediately." Upon information and belief, this statement was false and/or misleading when made, given the missing electrical breakers and numerous other issues

10

identified on punch lists provided to Travelers, including, but not limited to, damaged and clogged shower drains, missing appliances, missing flooring, missing door knobs, and missing bathroom hardware, including shower rods. As explained to Travelers (and putting aside the electrical breakers issue), tenants need to be able to close doors and use the bathrooms. A true and correct copy of Mr. Camarota's January 17, 2025 email is attached as **Exhibit J**.

49. On January 20, 2025, Mr. Camarota again emailed ZP, claiming that all units had been ready for tenants to move in since January 17, and that "there are no punch list items preventing any tenant from moving into a unit." For many of the same reasons identified above, these representations were false at the time they were made. A true and correct copy of Mr. Camarota's January 20, 2025 email is attached as **Exhibit K**.

50. The next day, ZP responded to Mr. Camarota, and explained that the units were not, in fact, in a condition to be accepted and occupied. A true and correct copy of the January 21, 2025 email to Mr. Camarota is attached as **Exhibit L**.

51. ZP followed up on January 29, noting that it appeared Perini's superintendent was on vacation, and ZP had not heard back from Mr. McCullough on the outstanding issues and timeline for fully completing all units. ZP reminded Travelers that a number of issues existed causing delays in acceptance and occupancy of the units and noted that visible damage had occurred in some units, which also had to be addressed. A true and correct copy of the January 29, 2025 email to Mr. Camarota is attached as **Exhibit M**.

52. On January 29, 2025, Mr. Camarota responded, claiming in writing that (among other things) "the punch list for all units is complete." For many of the same reasons identified above, that statement was false. A true and correct copy of Mr. Camarota's January 29, 2025 email is attached as **Exhibit N**.

53. The ongoing, years-long delay in completing the Project is attributable to Huffman and, subsequently, Travelers, and has caused significant damage and financial loss to ZP.

54. ZP has continued to make payments to Travelers from the approved contract balance, consistent with the Contract, Bond, and Takeover Agreement, based on the percentage of work that Travelers and Perini had reported as completed.

55. ZP has also incurred numerous project expenses and costs owed to ZP under the Contract, Bond, and Takeover Agreement, and has suffered tens of millions of dollars in damages relating to the Project, including, but not limited to, credits and expenses owed to ZP for costs to repair and complete certain items on the Project, significant delay and consequential damages, loss of rent, loss in value of the property, additional consulting and design professional fees, additional builders risk insurance costs, project management expenses, legal fees, re-finance costs, additional construction loan interest, additional interested owed to ZP's investors on the Project, liquidated damages, and other damages arising out of the defects and delays caused by Huffman and Travelers on the Project, and more recently, Travelers' misrepresentations as to the condition of the units and ZP's ability to begin moving tenants in.

56. Neither Huffman nor Travelers has reimbursed ZP for any of the costs, expenses, or damages arising out of the Project, Huffman's defective and negligent work, or Travelers' inability to complete the Project in a timely manner.

57. As a result of Huffman's and Travelers' misconduct and breaches of their respective duties under the Contract, the Bond, and Virginia tort law, ZP has incurred, and will continue to incur, substantial damages, including those noted above.

58. In addition to the foregoing, the Contract and the Bond require Huffman and Travelers to indemnify ZP from any damages, losses, and expenses, including attorneys' fees, arising from

their breaches of the Contract and the Bond. Therefore, ZP also seeks recovery of its attorneys' fees as allowed by the Contract and the Bond, and applicable Virginia law.

## COUNT I
### (Breach of Contract — Huffman)

59.   ZP repeats and re-alleges each and every allegation contained in Paragraphs 1 through 58, as if fully set forth herein.

60.   ZP and Huffman entered into the Contract, whereby Huffman was obligated to complete the Project in a timely manner in accordance with the requirements of the Contract.

61.   Huffman breached its obligations under the Contract by, among other things, failing to timely and properly perform the work, furnish the materials needed for the work, and oversee the work performed by its subcontractors, performing defective and deficient work (including work performed by subcontractors on Huffman's behalf, which damaged other work and property on the Project), and failing to complete the Project. Ultimately, Huffman was terminated pursuant to the terms of the Contract.

62.   As a result of Huffman's breaches of the Contract, ZP has incurred, and will incur, substantial costs and damages, including, but not limited to, the costs and damages alleged above.

63.   Pursuant to the express terms of the Contract, Huffman (and by extension, Travelers) is required to indemnify ZP for any and all damages, losses, and expenses, including, but not limited to, attorneys' fees arising out of or resulting from performance of the work and caused by Huffman's breaches of the Contract and negligent acts or omissions. *See* Contract, General Conditions § 4.15.1.

## COUNT II
### (Negligence — Huffman)

64.   ZP repeats and re-alleges each and every allegation contained in Paragraphs 1 through 58, as if fully set forth herein.

65. Huffman owed a duty to ZP to hire and utilize reasonably qualified and competent project managers, superintendents, and other personnel for the Project and to construct the Project in a reasonably prudent manner in accordance with the standard of care exercised by general contractors on similar projects in the Commonwealth of Virginia.

66. Huffman breached its duty of care to ZP by hiring and utilizing project managers and superintendents who were both unqualified and unfocused on their work and responsibilities, and by failing to construct and complete the Project consistent with the standard of care exercised by general contractors on similar projects in the Commonwealth of Virginia, including the deficiencies in the envelope, framing, and roofing systems, which caused water intrusion and related damage to other work on the Project, and resulting delays.

67. As a direct and proximate result of Huffman's negligence, ZP has suffered and continues to suffer damages, including, but not limited to, the costs and damages alleged above.

## COUNT III
**(Breach of Bonds — Travelers and Huffman)**

68. ZP repeats and re-alleges each and every allegation contained in Paragraphs 1 through 58, as if fully set forth herein.

69. Defendants Huffman and Travelers issued the Bond to ZP, as obligee.

70. ZP terminated Defendant Huffman for cause on the Project and issued timely demand to Defendants Travelers and Huffman to perform their obligations under the Bond by, among other things, completing the Project and/or reimbursing ZP for its costs and damages under the Contract and Bonds.

71. Defendants Travelers and Huffman have joint and several liability to ZP under the Bond for all damages arising out of Huffman's breach of the Contract, including completion costs,

costs for project management, insurance, design, consulting and legal expenses incurred by ZP, as well as damages caused by delay in the completion of the Project caused by Travelers.

72. Due to the failure of Travelers and Huffman to fully and properly complete the Project in a timely manner, and reimburse ZP for its costs and damages incurred as a result of Huffman's and Traveler's breaches of the Contract and Bond, ZP has incurred, and will incur, substantial costs and damages, including attorneys' fees and related expenses, among other costs and damages noted above.

73. Pursuant to the express terms of the Bond, Huffman and Travelers are jointly and severally liable to ZP for any and all costs and damages incurred as a result of Defendant Huffman's breach of the Contract and failure to complete its work on the Project, for any delay in the completion of the Project caused by Huffman or Travelers, and for ZP's attorneys' fees, litigation expenses, and other costs incurred in bringing this action.

### COUNT IV
**(Fraudulent Misrepresentation — Travelers)**

74. ZP repeats and re-alleges each and every allegation contained in Paragraphs 1 through 58, as if fully set forth herein.

75. As detailed above, Travelers made false representations of material fact to ZP and the City of Norfolk by misrepresenting and/or concealing missing electrical breakers in a number of units and the status and nature of other issues preventing the units from being fully and safely occupied.

76. As further detailed above, these misrepresentations were made on or around January 17, January 20, and January 29, 2025, by or on behalf of Stephen McCullough (Perini) and Francis Camarota (Travelers).

77. These misrepresentations and concealments were, upon information and belief, made intentionally and knowingly and with the intent to deceive ZP and the City of Norfolk into believing the units were fully completed and could be safely and fully occupied.

78. In reliance on Travelers' misrepresentations and concealments as to the condition and habitability of the units and the timeframe for delivering final occupancy, ZP was forced to provide tenants with additional rent concessions, incur additional legal fees to address Travelers' conduct, and further delay final completion of the Project.

## COUNT V
### (Constructive Fraud — Travelers)

79. ZP repeats and re-alleges each and every allegation contained in Paragraphs 1 through 58, as if fully set forth herein.

80. In the alternative to Count IV, Travelers negligently made false representations of material fact to ZP and the City of Norfolk by misrepresenting and/or concealing missing electrical breakers in a number of units and the status and nature of other issues preventing the units from being fully and safely occupied.

81. As further detailed above, these misrepresentations were made on or around January 17, January 20, and January 29, 2025, by or on behalf of Stephen McCullough (Perini) and Francis Camarota (Travelers).

82. In the alternative to Count IV, these misrepresentations and concealments were, upon information and belief, at least negligently made.

83. In reliance on Travelers' misrepresentations and concealments as to the condition and habitability of the units, and the timeframe for delivering final occupancy, ZP was forced to provide tenants with additional rent concessions, incur additional legal fees to address Travelers' conduct, and further delay final completion of the Project.

## COUNT VI
## (Negligence — Travelers)

84. ZP repeats and re-alleges each and every allegation contained in Paragraphs 1 through 58, as if fully set forth herein.

85. In undertaking to complete construction of the Project, Travelers assumed a duty to exercise reasonable care in evaluating and selecting the contractor that would adequately and timely correct and complete the work and avoid further damage to ZP.

86. Travelers breached its duty of care to ZP in selecting Perini to serve as the completion contractor for the Project, in that, upon information and belief, Travelers failed to exercise reasonable care in selecting and retaining a contractor with project managers and other personnel experienced and competent in the work and locality at issue.

87. As a direct and proximate result of Travelers' negligence in selecting a contractor to carry out the completion of the Project, ZP has suffered and continues to suffer significant damages, including, but not limited to, additional liquidated damages, delay damages, actual and consequential damages, and other damages, including the items alleged above.

## DEMAND FOR ATTORNEYS' FEES

Plaintiff demands attorneys' fees as permitted under the terms of both the Contract and the Bond. Section 4.15 of the General Conditions of the Contract states: "To the fullest extent permitted by law, the Contractor shall indemnify, reimburse, bold harmless, and defend the Owner ... from and against claims, damages, losses and expenses, including, but not limited to, attorneys' fees ... arising out of or resulting from performance of the Work." Section 7.3 of the Bond states: "[T]he Surety shall indemnify the Claimant for the reasonable attorney's fees the Claimant incurs thereafter to recover any sums found to be due and owing to the Claimant."

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff ZP No. 332, LLC, by counsel, prays that this Court enter judgment in Plaintiff's favor in an amount to be determined at trial, plus punitive damages as may be warranted against Travelers under applicable law, attorneys' fees, costs, expenses, and pre- and post-judgment interest, and any other relief the Court deems just and proper.

Dated:  February 26, 2025

Respectfully submitted,

*/s/ Betty S.W. Graumlich*
Betty S.W. Graumlich (VSB No. 30825)
Douglas E. Pittman (VSB No. 87915)
Reed Smith LLP
Riverfront Plaza – West Tower
901 East Byrd Street, Suite 1900
Richmond, Virginia 23219
Telephone: (804) 344-3400
Facsimile: (804) 344-3410
bgraumlich@reedsmith.com
dpittman@reedsmith.com

Garrett Nemeroff (admitted pro hac vice)
Wesley Butensky (admitted pro hac vice)
Reed Smith LLP
200 S Biscayne Blvd, Suite 2600
Miami, FL 33131
Telephone: (786) 747-0200
Facsimile: (786) 747-0299
gnemeroff@reedsmith.com
wbutensky@reedsmith.com

*Counsel for Plaintiff/Counterclaim Defendant ZP No. 332, LLC and Third-Party Defendant Atlantic Union Bank*