## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| ZP NO. 332, LLC, | |
|     Plaintiff, | |
|     v. | Case No. 2:24-cv-611 |
| HUFFMAN CONTRACTORS, INC., *et al.*, | |
|     Defendants. | |

## <u>OPINION & ORDER</u>

Plaintiff ZP No. 332, LLC hired Defendant Huffman Contractors, Inc. as the general contractor on a real estate development project. Huffman allegedly failed to complete the work adequately, and ZP eventually declared a default on the construction contract. That gave the parties' surety, Travelers Casualty and Surety Company of America, several options under a performance bond. From those options, Travelers chose to take over Huffman's contract, hire subcontractors, and finish the project. ZP claims Travelers did not fulfill the construction contract adequately after it took over. ZP sued both Huffman and Travelers for breach of contract.

All three parties filed motions for partial summary judgment, and each of the defendants filed a motion to exclude one of ZP's expert witnesses. This opinion addresses both of the defendants' motions for summary judgment (ECF Nos. 220, 230) and Huffman's *Daubert* motion regarding Kevin Coyne (ECF No. 224).

The Court will:

(1)    deny summary judgment that liquidated damages are ZP's exclusive remedy against the defendants;

(2)    deny Huffman's *Daubert* motion regarding Coyne;

(3)    grant summary judgment in favor of the defendants on ZP's lost value claim, because ZP's proof depends on certain testimony of Robert Jones, which is inadmissible;

(4)    deny summary judgment to Travelers regarding attorney fees, because there remains a genuine dispute as to whether the parties provided for attorney fees in the event ZP were to prove Travelers breached the performance bond independent of Huffman's breach; and

(5)    grant summary judgment that ZP's recovery against Travelers is capped at the amount of the performance bond. The Court finds that such recovery is limited by the amount Travelers already spent to fulfill Huffman's obligations under the construction contract but not by the amount of Travelers's legal and expert costs.

## I.    BACKGROUND

The parties do not dispute the following facts:[1]

1.    ZP and Huffman executed a construction contract with a guaranteed maximum price of $31,272,000. ECF No. 52-4 § 5.2.

2.    The construction contract contained the following provision regarding delays:

In the event [Huffman] fails to complete the Work according to the dates set forth in Exhibit J . . . [Huffman]

---

[1] The Court includes only the facts required for its decisions on the motions addressed in this Opinion and Order.

2

> agrees that [ZP] shall be entitled to the liquidated damages set forth in Exhibit J (which may be assessed on a cumulative basis). [Huffman] acknowledges and agrees that the liquidated damages set forth in Exhibit J are a reasonable estimate of [ZP's] damages in the event of a delay in the completion of the Work, and that such damages are difficult to calculate with certainty.

ECF No. 52-4 § 4.2 (emphasis removed); *see also id.* at 129 (liquidated damages schedule).

3.      Travelers issued a performance bond in the amount of $31,272,000. ECF No. 52-4 at 2–4 (performance bond).

4.      ZP terminated the construction contract for cause and made a demand that Travelers perform under the bond. ECF No. 235 at 11 ¶ 11; ECF No. 261 at 10 ¶ 11.

5.      After ZP's demand, Travelers had several options according to the performance bond. ECF No. 235 at 11 ¶ 12; ECF No. 261 at 10 ¶ 12 (disputing only the number of options available); *see* ECF No. 62-2 at 3 § 5.1–5.4.

6.      Travelers chose to proceed under § 5.2 of the performance bond, taking over Huffman's duties on the construction contract and hiring a contractor to finish the project in Huffman's place. ECF No. 235 at 12 ¶ 15; ECF No. 261 at 11 ¶ 15 (not disputing these facts).

7.      The performance bond provides:

> If the Surety elects to act under Section 5.1, 5.2 or 5.3, then the responsibilities of the Surety to the Owner shall not be greater than those of the Contractor under the Construction Contract, and the responsibilities of the Owner to the Surety shall not be greater than those of the Owner under the Construction Contract. Subject to the

3

commitment by the Owner to pay the Balance of the Contract Price, the Surety is obligated, without duplication, for

> .1[2]   the responsibilities of the Contractor for correction of defective work and completion of the Construction Contract;

> .2   additional legal, design professional and delay costs resulting from the Contractor's Default, and resulting from the actions or failure to act of the Surety under Section 5; and

> .3   liquidated damages, or if no liquidated damages are specified in the Construction Contract, actual damages caused by delayed performance or non-performance of the Contractor.

ECF No. 62-2 at 3 § 7.

8.    As a result of Travelers's election to proceed under § 5.2, ZP and Travelers executed a takeover agreement. ECF No. 235 at 12 ¶ 15; ECF No. 261 at 11 ¶ 15 (not disputing this fact); *see* ECF No. 62-5 (takeover agreement).

9.    The takeover agreement provides that $31,272,000 is Travelers's "single limit of liability." ECF No. 235 at 13 ¶ 17; ECF No. 261 at 12 ¶ 17 (not disputing this fact); *see* ECF No. 62-5 §§ 11, 16, 21, 26.

10.    The takeover agreement states:

> From time to time, the Surety agrees to expend or pay such of its own funds as may be necessary to pay for the completion of the Remaining Work, the correction or repair of the Remaining Work or work previously performed under the General

---

[2] The performance bond uses this format—a period before the numeral—to designate subsections of § 7. This Opinion and Order adopts the parties' format for referencing subsections in line.

Contract, pay the Completing Contractor, reimburse or pay the Owner for any and all damages or settlements of any nature or description; provided, however, that the Surety's obligations and liability under the Performance Bond, the General Contract and/or this Agreement, over and above the amount paid by the Owner and received by the Surety under this Agreement, shall, in no event, exceed, and it is hereby expressly limited to, the expenditure or payment of the penal amount of the Performance Bond ($31,272,000), which amount is the Surety's single limit of liability for its completion obligations . . . for all three of these contracts . . . , as reduced by all amounts expended or paid by the Surety after the date of the Principal's default, including, but not limited to, all expenditures or payments made to complete the Remaining Work, to correct or repair the Remaining Work or work previously performed under the General Contract, pay the Completing Contractor, pay third-parties to monitor and/or administer the Contract with the Completing Contractor on the Surety's behalf, or to return, confirm or mobilize subcontractors, vendors or others to complete or correct or repair the Remaining Work or work previously performed under the General Contract, reimburse or pay the Owner for any and all damages or settlements of any nature or description, including the amount described in Exhibit B- 1 of this Agreement, and/or defend, adjust and satisfy any claims under the Performance Bond, General Contract, and/or this Agreement. For each dollar the Surety so expends or pays pursuant to the Performance Bond, General Contract, and/or this Agreement, the Surety shall receive a corresponding dollar-for-dollar reduction in the amount of its single limit of liability for all three of these contracts . . . , which is the penal amount of the Performance Bond ($31,272,000).

ECF No. 62-5 § 11.

11.     Travelers paid subcontractors to complete work after the takeover agreement. ECF No. 235 at 14 ¶ 21; ECF No. 261 at 12 ¶ 21.

12.     Among ZP's claims in this case is lost property value in the amount of $29,209,829.59. ECF No. 235 at 14 ¶ 24; ECF No. 261 at 13 ¶ 24 (not disputing this fact).

5

## II.    LEGAL STANDARDS

### A.    Summary Judgment

A court may "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A "dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

"The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine dispute of material fact." *Med. Mut. Ins. Co. of N. Carolina v. Gnik*, 93 F.4th 192, 200 (4th Cir. 2024) (citation omitted); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To do that, the movant must support their assertions as to undisputed facts by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the . . . presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

If the moving party is successful in the first instance, then the burden "shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial." *Gnik*, 93 F.4th at 200 (citation and quotation marks omitted); *see Celotex*, 477 U.S. at 324. "The facts and all justifiable inferences arising therefrom must be viewed in the light most favorable to the non-movant." *Gnik*, 93 F.4th at 200 (citation omitted). However, if the non-movant "fails to properly support an assertion of fact

or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion" or may "grant summary judgment if the motion and supporting materials . . . show that the movant is entitled to it." Fed. R. Civ. P. 56(e). In deciding a motion for summary judgment, the court is not required to consider any materials in the record outside what the parties include with their briefing. Fed. R. Civ. P. 56(c)(3).

### B.    Motions to Exclude Expert Testimony

A "witness who is qualified as an expert by knowledge, skill, experience, training, or education" may "testify in the form of an opinion or otherwise" if:

(a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)    the testimony is based on sufficient facts or data;

(c)    the testimony is the product of reliable principles and methods; and

(d)    the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

A district court considering the admissibility of expert testimony acts as a gatekeeper in assessing whether the proffered testimony is both reliable and relevant. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). "[T]he test of reliability is flexible[,] and the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007)

(citation and quotation marks omitted) (emphasis removed). The reliability inquiry focuses on the "principles and methodology employed by the expert, not on the conclusions reached." *United States v. Moreland*, 437 F.3d 424, 433 (4th Cir. 2006) (citation and quotations marks omitted).

## III.   ANALYSIS

### A.   Liquidated Damages

Huffman and Travelers both seek judgment that ZP's recovery for project delays is limited to the liquidated damages laid out in the construction contract. While the reasons differ as to each defendant, neither is entitled to judgment on this issue.

#### i.   *Huffman*

The record does not support judgment in Huffman's favor on the liquidated damages question because the construction contract's liquidated damages clause itself does not explicitly establish an exclusive remedy, and another clause, which applies to the entire contract, confirms that liquidated damages are additional to other legal remedies.

"Under Virginia law,[3] a contractual remedy [is] exclusive only where the language employed in the contract clearly shows an intent that the remedy be

---

[3] Federal courts sitting in diversity apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941). In Virginia, courts apply the law that the parties expressly stated governs their contract, unless a party establishes that the choice of law provisions are unfair or unreasonable. *Paul Bus. Sys., Inc. v. Canon U.S.A., Inc.*, 397 S.E.2d 804, 807 (Va. 1990). Here, the construction contract contains an undisputed choice of law provision stating that it is "governed by the law of the place where the [p]roject is located." ECF No. 54-2  at 106 § 14.1.1.

exclusive." *Wood v. Martin*, 848 S.E.2d 809, 816 (Va. 2000) (emphasis in original) (citation and quotation marks omitted); *see also Bender-Miller Co. v. Thomwood Farms, Inc.*, 179 S.E.2d 636, 638 (Va. 1971).

To determine the parties' intent from the language of the instrument, the Court must "construe the contract as a whole" and "harmonize[]" its "various provisions." *Schuiling v. Harris*, 747 S.E.2d 833, 836 (Va. 2013). Here, that is not difficult. Section 4.2 of the construction contract entitles ZP to "the liquidated damages set forth in Exhibit J," but neither § 4.2 nor Exhibit J says anything about excluding the possibility of actual damages (or any other remedy). ECF No. 54-2 § 4.2; *id.* at 129. And § 14.3.1 specifically states that the remedies available under the construction contract are *not* exclusive but rather additional to other "remedies . . . available by law." ECF No. 54-2 at 107 § 14.3.1.

Huffman asserts that § 4.2 "by any plain reading[] states that the liquidated damages figures set forth in Exhibit J '*are*' ZP's 'damages in the event of delay in completion of the [w]ork." ECF No. 221 at 14 (quoting ECF No. 54-2 § 4.2) (emphasis added in Huffman's brief). That is not what the contract says: It actually states that "the liquidated damages set forth in Exhibit J *are* a reasonable estimate of [ZP's] damages in the event of a delay in the completion of the [w]ork." ECF No. 54-2 § 4.2 (emphasis added). That is unambiguously a statement about the expected adequacy of the liquidated damages remedy, not about its exclusivity.

---

The project is located in Norfolk, Virginia, so Virginia substantive law governs the contract. *See id.* at 28, 30, 37, 39–41.

9

Huffman also contends that the very existence of the liquidated damages provision implies it is exclusive, because otherwise "Exhibit J would function as no more than a penalty to Huffman" and "would [] provide an unconscionable double-recovery and windfall to ZP." ECF No. 221 at 16.[4] As an initial matter, the Court must not read into the contract a provision the parties could have written[5] but did not. *See Cave Hill Corp. v. Hiers*, 570 S.E.2d 790, 793 (Va. 2002) ("[T]he function of

---

[4] Huffman cites a case from this District that asserts "[t]he purpose of liquidated damages clauses . . . is to eliminate uncertainty regarding exposure for delay damages *by setting a cap on recovery*[] and also to avoid litigation over damages." ECF No. 221 at 16–17 (quoting *APM Terminals Virginia, Inc. v. Shanghai Zhenhua Heavy Indus. Co., Ltd.*, No. 2:11-cv-100, 2012 WL 3522671, at *5 (E.D. Va. Aug. 14, 2012)) (emphasis in Huffman's brief, additional emphasis removed). But this Court is not bound by other district judges' decisions, and *APM* is not persuasive. It does not cite Virginia law to support its assertion, and insofar as it purports to identify the sole "purpose of liquidated damages," its reference to a "cap on recovery" is inconsistent with binding authority. *APM*, 2012 WL 3522671, at *5; *see O'Brian v. Langley Sch.*, 507 S.E.2d 363, 366 (Va. 1998) ("[T]he purpose of a liquidated damages provision is to obviate the need for the nonbreaching party to prove actual damages.").

Alternatively, if *APM*'s statement is correct, it does not dictate the outcome Huffman argues it does. Despite claiming to identify the purpose (singular) of liquidated damages, *APM* actually lists two purposes: eliminating uncertainty "and also" avoiding damages litigation. 2012 WL 3522671, at *5. A nonexclusive liquidated damages provision like the one in the construction contract here fits both of those purposes without "setting a cap on recovery": It reduces uncertainty by setting a damages *floor*, which enables the parties to identify efficient breaches in an industry that is notorious for delays; and it limits litigation over damages by requiring detailed proof only when damages exceed the amounts provided in Exhibit J. *Id.*

[5] If the parties had intended liquidated damages to be an exclusive remedy for delays, it would have been easy for them to say so. *See, e.g.*, *Westmoreland-LG&E Partners v. Virginia Elec. & Power Co.*, 486 S.E.2d 289, 292, 296 (Va. 1997) (finding that a contract excluded other remedies where the liquidated damages clause said "the payment of the liquidated damages is in lieu of actual damages"). But that is not what they said.

the court is to construe the contract made by the parties, not to make a contract for them.").

Additionally, the mere availability of actual damages does not render liquidated damages a "penalty." Liquidated damages "may constitute an unenforceable penalty if the agreed amount is grossly in excess of actual damages." *Gordonsville Energy, L.P. v. Virginia Elec. & Power Co.*, 512 S.E.2d 811, 818 (Va. 1999) (citation and quotation marks omitted). Huffman makes no attempt to prove the amount of actual damages at summary judgment, so it does not demonstrate the absence of a genuine dispute as to whether the liquidated damages in the construction contract are a 'penalty.'

Likewise, Huffman fails to demonstrate that ZP would recover 'double' if the contract permits it to seek actual damages as well.[6] ECF No. 221 at 16. Virginia prohibits "double recovery for a single injury." *Dominion Res., Inc. v. Alstom Power, Inc.*, 825 S.E.2d 752, 755 (Va. 2019). The parties cite no case—and this Court can find none—in which a Virginia court directly determined whether a plaintiff suing for breach of a contract with a nonexclusive liquidated damages clause is permitted to

---

[6] Insofar as Huffman intends to argue separately that the liquidated damages clause would be "unconscionable" if actual damages were also available, that argument fails, too. ECF No. 221 at 16. Huffman appears to suggest that a nonexclusive liquidated damages provision would be unconscionable because no one in Huffman's position would agree to such a term. But the Court can easily imagine a general contractor agreeing to a schedule of liquidated damages to—for example—establish a rule by which it could decide when to incur extra labor costs or inconvenience to avoid a delay versus when to effectuate an efficient breach of the contract. Because there is no risk of double recovery (as explained above), such a term would seem entirely reasonable. At least Huffman does not eliminate any genuine dispute that it is.

prove actual damages above the liquidated sum. However, taking together other clear statements of Virginia law, this Court concludes such proof must be allowed. *See Knibbs v. Momphard*, 30 F.4th 200, 213 (4th Cir. 2022) (when the relevant state's highest court has issued no decision on point, a federal court applying state law must "predict" the law the state's highest court would apply).

Virginia recognizes the "fundamental principle" that "a plaintiff may not receive a double recovery for a single injury." *Dominion Res., Inc., Inc.*, 825 S.E.2d at 755 (collecting cases). But in breach of contract cases, the purpose of damages "is to make amends or reparations by putting the party injured in the same position . . . as [they] would have been if the contract had been performed." *Appalachian Power Co. v. John Stewart Walker, Inc.*, 201 S.E.2d 758, 767 (Va. 1974) (citation and quotations omitted). Therefore, "[a] successful plaintiff is *entitled* to recover those damages [that] are the natural and direct result of the breach of the contract." *Id.* (citation and quotations omitted, emphasis added). So absent a clear expression of intent to the contrary, contract law in Virginia entitles a successful plaintiff to recover actual damages beyond a liquidated sum when they prove such damages are required to make them whole. *Cf. Brooks v. Bankson*, 445 S.E.2d 473, 479 (Va. 1994) (finding a liquidated damages clause enforceable in a contract that also included a "provision[] for actual damages"). Therefore, although ZP would be entitled to prove actual

damages that *exceed* the liquidated damages, no reasonable jury, properly instructed, would award ZP double.[7]

For all these reasons, Huffman is not entitled to judgment that liquidated damages are ZP's sole remedy for project delays.

### ii.  Travelers

Travelers's motion essentially imports Huffman's argument about liquidated damages and asserts that because the surety's responsibility under the performance bond does not exceed the contractor's responsibly under the contract, Travelers cannot owe actual damages for delay because *Huffman* cannot. That argument fails first for the reasons described above.

Travelers is also wrong for a separate reason, related to the terms of the performance bond itself. The performance bond treats liquidated versus actual damages differently than the construction contract does. Under the performance bond, Travelers may owe actual damages caused by Huffman's delayed performance or non-performance of the contract only if the contract does not specify any liquidated damages. ECF No. 62-2 at 3 § 7.3. As discussed above, the contract does specify liquidated damages (though it does not make them an exclusive remedy). So

---

[7] Huffman also argues that the liquidated damages clause would be invalid as a matter of law if ZP's actual damages were grossly out of proportion to amounts provided in Exhibit J. Because the amount of actual damages to which ZP is entitled is genuinely disputed—and, therefore, so is whether that sum grossly outstrips the liquidated damages—the Court cannot find judgment proper on these grounds. Additionally, based on the principles described above, the Court concludes that Virginia law only invalidates a liquidated damages provision on this basis when liquidated damages are an exclusive remedy, which is not the case here.

Travelers is not liable to ZP for actual damages related to *Huffman's* breach. However, Travelers may owe actual damages under the performance bond for its own breaches. Specifically, Travelers is responsible for "delay costs resulting from . . . the actions or failure to act . . . under [§] 5." ECF No. 62-2 at 3 § 7.2. There remains a genuine dispute as to whether ZP incurred delay costs as a result of Travelers's takeover of the construction contract under § 5.2, so the Court must deny summary judgment on this ground.

## B.    Lost Value

Huffman and Travelers both contend that they are entitled to judgment on ZP's claim for lost property value because ZP does not have an expert witness who can prove lost value with admissible testimony. While ZP carries its burden to demonstrate a genuine dispute as to the cause of its alleged lost value damages, it does not proffer admissible expert testimony to substantiate the amount of damages. Because a difference in value—*i.e.*, at least some amount of damages—is an essential element of a lost value claim, the defendants are entitled to judgment here.

Virginia law[8] requires expert testimony on issues that are "beyond the realm of common knowledge and experience of a lay jury." *Beverly Enters.-Virginia, Inc. v. Nichols*, 441 S.E.2d 1, 3 (Va. 1994). The Court finds that property value is such an issue and therefore that ZP must proffer admissible expert testimony to survive

---

[8] Federal courts sitting in diversity apply state substantive law and federal procedural law. *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014). Rules about the sufficiency of evidence are substantive. *See Creekmore v. Maryview Hosp.*, 662 F.3d 686, 690 (4th Cir. 2011).

summary judgment on its lost value claim.[9] *Cf. Seaward Int'l, Inc. v. Price Waterhouse*, 391 S.E.2d 283, 287 (Va. 1990) (applying the expert in the context of accounting audits).[10]

ZP promises to prove the cause of the property's lost value (*i.e.*, Huffman and Travelers's alleged delays) through a forensic scheduling expert, Kevin Coyne, and to prove damages associated with that lost value through its corporate representative, Robert Jones. ECF No. 262 at 19. In some cases, a plaintiff could prove a breach of contract claim without proving a specific amount of damages. *See Kerns v. Wells Fargo Bank, N.A.*, 818 S.E.2d 779, 785 (Va. 2018) (conditions for award of nominal damages). But here, the harm ZP claims is lost value, so it cannot prove *harm* without proving the expected value of the property absent the alleged breaches of contract and the actual value thereafter. *See Ramos v. Wells Fargo Bank, NA*, 770 S.E.2d 491, 493 (Va. 2015) (harm is an "essential element" of a breach of contract action); *Carstensen v. Chrisland Corp.*, 442 S.E.2d 660, 667 (Va. 1994) (plaintiff must "present evidence showing that their damage claims of loss in value represented the difference

---

[9] In this Opinion and Order, when the movant meets its initial burden of production by pointing directly to law or the language of a contractual instrument, the Court interprets the law or the instrument then moves to assessing whether the non-movant meets its burden. *See* Fed. R. Civ. P. 56(c)(1); *Gnik*, 93 F.4th at 200. In those circumstances, the Court does not make an explicit statement regarding the movant's burden, but it finds that the burden is met.

[10] It is not clear whether ZP disputes that Virginia's expert testimony rule applies here. *See* ECF No. 262 at 24 (attempting to distinguish cases in which Huffman claims the rule was applied). But even if the rule does not apply, the issue before the Court is the same: Since expert testimony is the only evidence ZP proffers in its attempt to demonstrate a genuine dispute as the amount of lost property value, the defendants are entitled to judgment if that evidence is inadmissible.

between the value of the property bargained for and the value of the property actually received"). Therefore, if either category of ZP's proffered evidence is inadmissible, its lost value claims fail as a matter of law.

Coyne's testimony about causation is admissible, but Jones's testimony about valuation is not.

### i.    *Kevin Coyne (Huffman's* Daubert *Motion)*

Coyne is a 'forensic scheduler' who purports to have performed a "detailed causation analysis" regarding alleged construction delays. ECF No. 248-1 ¶ 22.b. Huffman lodges three categories of complaints about Coyne's expected testimony: (1) He does not use what Huffman claims is the best available method; (2) his analysis disregards facts in Huffman's favor, such as evidence that ZP itself may have been responsible for some delays; and (3) his opinions are too favorable to ZP. Because all of Huffman's concerns go to weight, the motion to exclude Coyne's testimony will be denied.

First, Huffman argues that Coyne "does not [] cite" "the most recognized industry standard" for the form of analysis he used.[11] ECF No. 225 at 6–7. But while an expert's testimony must be based on "good grounds" and constitute "more than subjective belief or unsupported speculation," neither Fed. R. Evid. 702 nor *Daubert* requires an expert to use the method opposing counsel would select or even the best

---

[11] Huffman also asserts that Coyne does not mention "*any* [] schedule analysis standards." That is not true. ECF No. 225 at 7 (emphasis added). *See* ECF No. 225-2 at 38–97; *see also id*. at 125–132 (entire section devoted to explaining how he chose the analytical methods he used).

or most recommended method. *Daubert*, 509 U.S. at 589–90; *see Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021) ("Reliability is a 'flexible' inquiry that focuses on 'the principles and methodology' employed by the expert.") (quoting *Daubert*, 509 U.S. at 594–95); *BorgWarner, Inc. v. Honeywell Int'l, Inc.*, 750 F. Supp. 2d 596, 615 (W.D.N.C. 2010) (collecting cases). After reviewing his report and the opinions of Huffman's rebuttal expert, the Court finds that the principles and methods Coyne used are more likely than not reliable. *See* Fed. R. Evid. 702(c); *see generally* ECF Nos. 225-1, 225-2. Huffman is welcome to argue to the jury that Coyne should have taken a different approach.

Similarly, cross-examination—not exclusion—is the solution to Huffman's concerns about how Coyne handled facts allegedly unfavorable to ZP's position. Coyne discusses at length how he validated the data sources he relied on, and the Court finds that the facts that underlie his opinions are more likely than not sufficient. *See* Fed. R. Evid. 702(b); ECF No. 225-2 at 19–38. Defense counsel will be "permitted to fully explore the bases of [Coyne's] opinion" at trial, including by challenging his interpretation of facts Huffman believes help its case. *United States v. A & S Council Oil Co.*, 947 F.2d 1128, 1135 (4th Cir. 1991).

Huffman also asserts that *Daubert* and its Fourth Circuit progeny create a rule against biased experts. ECF No. 225 at 15–16 (arguing Coyne's "one-sided opinions" make his testimony "inadmissible"). To the extent that argument is about Coyne allegedly ignoring evidence that ZP itself may have contributed to project delays, it is simply the same contention addressed above, wearing a different mask, and the

17

Court already concluded Huffman's concern goes to weight, not admissibility. Insofar as Huffman raises a new issue here, it fails because credibility is a question for the jury, not a matter for a *Daubert* motion or summary judgment. *See Gunning v. Cooley*, 281 U.S. 90, 94 (1930) ("Issues that depend on the credibility of witnesses[] and the effect or weight of evidence[] are to be decided by the jury.").[12] So once again, the remedy for Huffman's objection is cross-examination.

Because all of Huffman's objections to Coyne's testimony go to weight, not admissibility, the Court will deny Huffman's *Daubert* motion. For the same reasons, ZP survives summary judgment with respect to the causation element of its lost value claims.

### ii. Robert Jones

Neither defendant filed a motion to exclude Jones's testimony in its entirety, but in its motion for summary judgment, Huffman challenges the admissibility of Jones's opinions about the value the property allegedly lost due to delays. The first issue Huffman raises—that the appraisals underlying Jones's calculations are hearsay—does not defeat ZP's claims. However, Huffman does meet its burden of

---

[12] Huffman cites a footnote in a Fourth Circuit case where the court expressed "grave concern" about the Social Security Administration repeatedly using what appeared to be a "hired gun expert" to defeat possibly meritorious claims. ECF No. 225 at 15 (quoting *Brown v. Comm'r Soc. Sec. Admin.*, 873 F.3d 251, 271 n.6 (4th Cir. 2017) (quotation marks omitted). *Brown* does not stand for the proposition that the testimony of a biased expert witness is inadmissible under Fed. R. Civ. P. 702. In fact, the Fourth Circuit explicitly said its decision "[did] not rely on" concerns about the witness's credibility. *Id.* The district court cases Huffman relies on are similarly unpersuasive.

production on a second issue, and ZP fails to raise a genuine dispute as to whether Jones is qualified to opine on the value of the property.

ZP asserts that Jones will calculate damages by comparing the development's original projected annual net operating income, capitalized at 4%, against the current projected annual value. While the appraisals Jones relied on are certainly hearsay, that does not make his testimony inadmissible. *See* Fed. R. Evid. 801 (defining hearsay); Fed. R. Civ. P. 703 (permitting an expert to rely on otherwise inadmissible hearsay "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject").[13]

However, ZP does not prove what (if any) methodology was used to create either of the operating income estimates that Jones used to calculate lost value damages. Jones explains that he divided the project's "net operating income [] by a capitalization rate at the time the [p]roject should have been completed," then "dividing the [net operating income] by a capitalization rate at the time the [p]roject was completed," and "comparing the two values." ECF No. 262-4 ¶ 19.b. Jones states that he was "involved in the decision to select the capitalization rates" but does not explain how the rates were derived. *Id.* ¶ 19.c. Nor does he explain how the net operating income was determined or who made that determination. And ZP offers no additional proof to fill these gaps. *See* ECF No. 262-3 (ZP's answers to interrogatories, identifying the formula Jones used but not how or by whom the underlying estimates

---

[13] Additionally, the rule against hearsay would not bar Jones from revealing the appraisals themselves to the jury, provided ZP showed that the appraisals' "probative value . . . substantially outweighs their prejudicial effect." Fed. R. Evid. 703.

were created); ECF No. 262-4 ¶ 19 (Jones declaration, defending the final formula but offering no explanation about the underlying estimates); *see also* ECF No. 262-2 at 16–18 (Jones deposition, discussing the property appraisals generally).

The capitalization rates and net operating income estimates on which Jones's calculations are based are, themselves, expert opinions. Without proof that those underlying opinions are based on sufficient facts and data and the result of reliable principles and methods reliably applied by a qualified individual, the Court cannot admit the testimony that implements them.

Additionally, ZP does not attempt to demonstrate that Jones himself has the "knowledge, skill, experience, training, or education" to create (or recreate) these estimates on his own. While his experience as a development director and his education in real estate finance might qualify him to synthesize otherwise admissible data created by a qualified real estate appraiser, it does not enable him to vouch for the reliability of data whose source and methodology is entirely unproven. ECF No. 262-4 ¶¶ 1, 4.[14] *Cf. Hornback v. State Highway Comm'r*, 135 S.E.2d 136, 140 (Va.

---

[14] To the extent ZP argues that Jones's testimony about valuation is based on his experience rather than scientific determinations, that does not solve the problem. There are "meaningful differences in how reliability must be examined with respect to expert testimony that is primarily experiential in nature as opposed to scientific," and experiential expert testimony "does not rely on 'anything like a scientific method,'" *Wilson*, 484 F.3d at 274 (quoting Fed. R. Evid. 702 advisory committee's note). And Fed. R. Evid. 702 "expressly contemplates that an expert may be *qualified* on the basis of experience." *Id.* (citing Fed. R. Evid. 702 advisory committee's note) (emphasis added). But the central issue here is not Jones's qualification. *See* Fed. R. Evid. 702(a). It the source of the underlying data Jones analyzed. Those data amount to *scientific* conclusions, and Jones's professional experience cannot substitute for a scientific method.

1964) (finding that that "[t]he opinion of an expert real estate appraiser" is based on their own knowledge of the property, but evidence that "some unnamed expert had also appraised the property" was properly excluded). Therefore, the proffered evidence is inadmissible under Fed. R. Civ. P. 702.

Accordingly, ZP fails to raise a genuine dispute as to whether the property lost value at all, and the defendants are entitled to judgment on the lost value claims.[15]

### C.     Attorney Fees

ZP cannot recover attorney fees against Travelers for Huffman's negligence as a matter of law, but there is a genuine dispute as to whether attorney fees would be available in the event ZP prevails on its claims based on Travelers's own alleged breach of the performance bond.[16]

The construction contract provides that Huffman—and, by assumption, Travelers, *see* ECF No. 62-2 at 3 § 5.2—will indemnify ZP for "attorney fees" that "aris[e] out of or result[] from performance of the [w]ork" outlined in the contract, "but only to the extent" such costs are the result of Huffman's negligence. ECF No. 54-2 at 80–81 § 4.15.1. But as the Court determined in ruling on Huffman's motion to dismiss, Huffman had no common law duty to ZP apart from its contractual duties.

---

[15] ZP has designated Jones as its corporate representative under Fed. R. Civ. P. 26(a)(1). The Court's conclusion that Jones's opinion about lost value is inadmissible should not be taken as a decision on the admissibility of any of his other testimony.

[16] In its opposition to Travelers's motion, ZP states that it seeks attorney fees under the performance bond only. ECF No. 261 at 13–14 ¶ 30. The Court considers whether the construction contract provides for attorney fees, because the performance bond incorporates elements of the construction contract by reference. But the Court will not consider whether the payment bond or the takeover agreement would support an award of attorney fees against Travelers, because ZP waives any such argument.

*See* ECF No. 147 at 54:24–25; *see also id.* at 54:15–21 (rejecting the contention that Huffman had a tort duty, because ZP "conceded . . . that the construction phase still is ongoing") (citing *Tingler v. Graystone Homes, Inc.*, 834 S.E.2d 244 (Va. 2019)). Therefore, it is beyond genuine dispute that no "negligent acts or omissions" by Huffman gave rise to ZP's claimed attorney fees.[17]

However, it is less clear whether the performance bond provides for attorney fees. Under Virginia law,[18] whether a written agreement supersedes the general rule against awarding attorney fees to a prevailing party is a matter of contract interpretation. *See Tonti v. Akbari*, 553 S.E.2d 769, 771–72 (2001). Section 7.2 of the performance bond states that Travelers is responsible for "legal . . . costs . . . resulting from the actions or failure to act of [Travelers] under [§] 5 (which deals with Travelers taking over Huffman's contract)." ECF No. 62-2 at 3 § 7.2.

Here, the meaning of the term 'legal costs' is ambiguous. To determine whether contract provisions are ambiguous, Virginia courts give words "their usual, ordinary, and popular meaning." *Babcock & Wilcox Co. v. Areva NP, Inc.*, 788 S.E.2d 237, 244 (Va. 2016). 'Legal costs' can include attorney fees, but the term also commonly refers only to "[t]he charges or fees taxed by [a] court." Cost, BLACK'S LAW DICTIONARY (12th ed. 2024); *see U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34, 77 (2d

---

[17] To be abundantly clear, the Court's ruling on this point depends not on the fact that there are no more negligence *claims* in this case but on the fact that ZP does not plausibly allege—much less put on evidence to prove—that Huffman has ever owed a negligence *duty* in connection with the construction project.

[18] Whether a prevailing party is entitled to attorney fees is a substantive question, governed by state law. *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 259 n.31 (1975).

Cir. 2004) (observing, in analyzing language identical to the contract language here, that "one of three standard dictionaries includes attorney[] fees in its definition of legal costs, while the others do not; and thus, these sources bring us no closer to resolving the disputed language").

When a contract term is ambiguous, courts look to extrinsic evidence to determine the parties' intent. *Robinson-Huntley v. George Washington Carver Mut. Homes Ass'n, Inc.*, 756 S.E.2d 415, 418 (2014). Here, neither party presents extrinsic evidence that might enable the Court to decide whether § 7.2 of the performance bond was intended to impose liability for attorney fees. Therefore, a genuine dispute remains, and Travelers is not entitled to judgment on this ground.[19] *See Braspetro*, 369 F.3d at 77 (coming to the same conclusion).[20]

---

[19] As a result, the Court will receive evidence regarding attorney fees after the jury trial, if ZP prevails against Travelers. *See* ECF No. 256 (granting joint motion to bifurcate).

[20] ZP also contends that it is entitled to attorney fees against Travelers under Virginia common law. The language ZP cites from *Long v. Abbruzzetti* is the *Long* court's summary of another decision. ECF No. 261 at 30 (quoting *Long v. Abbruzzetti*, 487 S.E.2d 217, 220 (Va. 1997) (describing *Hiss v. Friedberg*, 112 S.E.2d 871, 875–76 (Va. 1960)). *Hiss* held that attorney fees incurred in a lawsuit against party A are recoverable in a later lawsuit against party B where party B directly caused the breach of contract proved against party A. For *Hiss* to apply here, there would have to be a genuine dispute as to whether Travelers caused Huffman's breach, which of course no one is arguing.

However, *Long* itself might be a better fit for the present circumstances. It stands for the proposition that a plaintiff cannot recover from party B attorney fees incurred in a lawsuit against party A unless the plaintiff proves that the *party A lawsuit itself* was foreseeable at the time the plaintiff entered a contract with party B. Here, there is a genuine dispute as to whether ZP's claims against Huffman were foreseeable at the time the parties executed the performance bond.

### D.    Recovery Cap

The takeover agreement unambiguously caps Travelers's liability—for Huffman's alleged breaches and its own—at the amount of the bond: $31,272,000. That limit is reduced by the amount Travelers already spent to fulfill Huffman's obligations under the construction contract and by any damages Travelers owes to ZP in this case, but Travelers's legal and expert costs do not come out of the total.

### i.    *Penal Sum Generally*

If Travelers had chosen to proceed under any portion of §§ 5.1, 5.3, or 5.4 of the performance bond, then the bond itself would have limited its liability to "the amount of th[e] [b]ond." ECF No. 62-2 at 3 § 8. But because Travelers invoked § 5.2, taking over Huffman's construction contract, the bond does not impose a recovery cap.

However, the takeover agreement—which was executed after Travelers invoked § 5.2 of the performance bond and states that it controls in the case of any conflict with the language of the bond, *see* ECF No. 62-5 ¶ 26—*does* impose a recovery cap: the bond's "penal sum." *See* ECF No. 62-5 §§ 11, 21; *see also id.* § 11 (specifying that the "penal amount of the [p]erformance [b]ond" is "$31,272,000").

ZP argues that the takeover agreement only limits Travelers's liability for costs attributable to Huffman's breach, leaving damages related to delays for which Travelers itself is responsible uncapped. That is incorrect because, as outlined in the takeover agreement, Travelers's responsibility to "*complete* the [r]emaining [w]ork"— without exception if completion is delayed—was undertaken subject to the "single limit of liability for the [p]erformance [b]ond." ECF No. 62-5 § 21 (emphasis added).

24

### ii. Reductions

Travelers's liability at trial is reduced by the amount it already spent to fulfill the ZP-Huffman contract. Travelers "agree[d] to pay . . . for the completion of the [r]emaining [w]ork" using its "own funds," on the condition that Travelers's "obligations and liability under [all instruments except the payment bond]" were "limited to . . . the penal amount of . . . [$31,272,000]." ECF No. 62-5 § 11.[21]

Section 11 of the performance bond also unambiguously obligates Travelers to "reimburse or pay [ZP] for any and all damages or settlements of any nature or description," subject to the $31,272,000 penal sum. So any damages Travelers owes ZP in this case will be deducted from the penal sum.

However, the same does not go for Travelers's legal expert costs in this case. Section 11 obligates Travelers to "defend, adjust[,] and satisfy any claims under the [p]erformance [b]ond, [g]eneral [c]ontract, and/or [takeover] [a]greement." ECF No. 62-5 § 11. That clause would be absurd if it referred to Travelers's own defense against claims by ZP under the instruments: It would mean Travelers could exhaust its entire liability seeking to avoid its contract obligations through litigation, only to have nothing left under the cap to satisfy a judgment if it is wrong. The provision only makes sense if it obligates Travelers to defend *ZP* on claims by third parties

---

[21] Travelers's expenditures to fulfill Huffman's duties under the construction contract could, in theory, exhaust its entire liability, leaving nothing for ZP to recover at trial. *See* ECF No. 62-5 § 11 (If Travelers pays "the full penal amount of the [p]erformance [b]ond . . . then [Travelers] shall have no further obligation or liability of any description to [ZP]" on the "[p]erformance [b]ond, the [construction] [c]ontract, and/or [the takeover] [a]greement," and Travelers would "cease" to complete Huffman's work.).

(including Huffman). *See Transit Cas. Co. v. Hartman's, Inc.*, 239 S.E.2d 894, 896 (Va. 1978) ("the construction adopted should be reasonable, and absurd results are to be avoided"); *Seward v. Am. Hardware Co.*, 171 S.E. 650, 659 (Va. 1933) ("most obviously just" construction presumed to be "most in accordance" with the parties' intent); *accord Baistar Mech., Inc. v. Billy Casper Golf, LLC*, No. 141781, 2015 WL 10990120, at *3 (Va. Oct. 22, 2015) ("Any interpretation of a contract must be reasonable and just."). Therefore, the bond's reference to taking "defense and adjusting costs" out of the penal sum must refer only to costs ZP incurs defending claims under the instruments, not to Travelers's own expenses in defending against claims by ZP. Here, that would include only costs related to Huffman's counterclaims.

## IV.    CONCLUSION

Huffman Contractors, Inc.'s motion for summary judgment (ECF No. 220) is **GRANTED IN PART** and **DENIED IN PART**.

Huffman's motion to exclude the testimony of Kevin Coyne (ECF No. 224) is **DENIED**.

Travelers Casualty and Surety Company of America's motion for summary judgment (ECF No. 230) is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS SO ORDERED**.

_____ /s/
Jamar K. Walker
United States District Judge

Norfolk, Virginia
November 4, 2025