# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

**ZP NO. 332, LLC,**

      **Plaintiff/Counter-Defendant,**

**v.**                                               **Civil Action No. 2:24-cv-611**

**HUFFMAN CONTRACTORS, INC.,**

      **Defendant,**

**and**

**TRAVELERS CASUALTY AND**
**SURETY COMPANY OF AMERICA,**

      **Defendant/Counter-Plaintiff**
      **Third-Party Plaintiff,**

**v.**

**ATLANTIC UNION BANK,[1]**

      **Third-Party Defendant,**

## OPINION AND ORDER

This Opinion and Order clarifies the limits of testimony by industry experts for both Plaintiff ZP No. 332, LLC ("ZP") and Defendant Travelers Casualty and Surety Company of America ("Travelers") in this complex construction case. ZP moved to exclude Travelers' experts Sam Haagenson, Kieran O'Connor, and J. Mark Dungan, (ECF No. 228), and Travelers sought to bar ZP's expert Christopher J. Payne, (ECF No. 222), and limit testimony in Section 3.5 of Payne's rebuttal report due to late disclosed supporting material, (ECF No. 243). ZP argues that Travelers' experts impermissibly: (1) make legal conclusions by interpreting the contract at issue to determine

---

[1] As of November 6, 2025, the parties in this case have jointly stipulated to the dismissal with prejudice of Atlantic Union Bank as to Travelers Casualty and Surety Company of America's Third-Party Complaint, (ECF No. 309).

whether it was breached; (2) testify about industry standards, going against controlling law that limits the parties' rights and obligations to the terms of the contracts; (3) opine about ZP's "knowledge, intent, and state of mind," which is "outside the bounds of proper expert testimony;" and (4) fail to base their opinion on "any discernible or reliable methodology," making their testimony "nothing more than *ipse dixit*." Mem. P. & A. Supp. ZP's Mot. Exclude Test. ("ZP Mem."), at 2-3 (ECF No. 229, at 8-9). Additionally, ZP argues that Travelers' experts offer cumulative testimony from the same discipline. Id. at 3 (ECF No. 229, at 9). Travelers similarly argues the court should exclude Payne's testimony "concerning an owner's duties of care to a performance bond surety and ZP's alleged compliance with its duties" because he "improperly proffers legal conclusions" that would mislead the court and jury. Mem. L. Supp. Travelers' Mot. FRE 702, ("Travelers FRE 702 Mem."), at 1 (ECF No. 223, at 5). Further, Travelers seeks to bar opinions in Section 3.5 of Payne's rebuttal report under Rule 37(c)(1) of the Federal Rules of Civil Procedure because Payne's damages calculations rely on analysis of invoice data from an undisclosed spreadsheet. Travelers Mem. Supp. Mot. Exclude Test. ("Travelers Section 3.5 Mem."), at 2-3 (ECF No. 244). All the motions are fully briefed, and on October 28, 2025, the court heard arguments of counsel via Zoom. For the reasons stated on the record then, and explained in detail below, the court GRANTS IN PART and DENIES IN PART all three motions. As requested by both parties, this Opinion offers guardrails to guide the proper examination of these four industry experts.

## I.    BACKGROUND

### A.    The Project

ZP and Huffman Contractors, Inc. ("Huffman") executed a construction contract in April 2021 to build an apartment complex in Norfolk, Virginia ("Project"), with ZP serving as the owner

and Huffman serving as the general contractor. Am. Compl. ¶¶ 1-2, 13-15 (ECF No. 62, at 1-2, 4); Am. Compl. Ex. A ("Construction Contract") (ECF No. 62-1). Huffman and Travelers executed and issued to ZP performance and payment bonds guaranteeing Huffman's performance of the contract and payment of its subcontractors and suppliers. Am. Compl. ¶ 16 (ECF No. 62, at 4); Am. Compl. Ex. B ("Performance Bond") (ECF No. 62-2). After ZP identified deficiencies and delays in construction, ZP terminated its contract with Huffman and called on Travelers to perform under the Performance Bond. Am. Compl. ¶¶ 18-24 (ECF No. 62, at 5-6); Am. Compl. Ex. D ("Notice of Termination") (ECF No. 62-4).

Travelers had several options under the Performance Bond but chose to take over Huffman's duties on the construction contract and hire a contractor to finish the Project in Huffman's place. Am. Compl. ¶ 25 (ECF No. 62, at 6). ZP and Travelers executed a Takeover Agreement, (ECF No. 62-5), under which Travelers assumed responsibility for completing the Project and hired Perini Management Services, Inc. ("Perini") to complete the remaining work. Id. ¶¶ 26-29 (ECF No. 62, at 6-7). Perini also faced delays in completing the Project but ultimately was able to complete construction. See id. ¶¶ 33-35 (ECF No. 62, at 7-8).

ZP brought several claims against Huffman and Travelers related to their allegedly deficient performance under the Construction Contract and Performance Bond. Id. ¶¶ 59-87 (ECF No. 62, at 13-17). After Travelers and Huffman moved to dismiss, the only cause of actions that remain are a breach of contract and a breach of bond claim. Mem. Order (ECF No. 137).[2] Travelers also filed contract-based counterclaims against ZP. Def.'s Answer, Affirmative Defenses, Countercl., & Third-Party Compl. ("Countercl.") (ECF No. 16). ZP seeks compensation

---

[2] On November 4, 2025, the court GRANTED IN PART and DENIED IN PART both Huffman's Motion for Summary Judgment, (ECF No. 220), and Travelers' Motion for Summary Judgment, (ECF No. 230). Op. & Order (ECF No. 293).

from Travelers for the costs it incurred as a result of Huffman's breach of contract and the delay in Travelers' completion of the Project. Am. Compl. ¶¶ 62-63, 71-73 (ECF No. 62, at 13-15). Travelers, on the other hand, is seeking reimbursements from ZP for expenses it incurred in excess of its obligations under the Performance Bond. Countercl. ¶¶ 98, 112 (ECF No. 16, at 30, 32). Each party offers expert testimony to help establish their claims, and at issue here is the scope of admissible analysis from construction industry experts.

## B.    The Parties' Experts

This Opinion addresses the testimony of four experts: Sam Haagenson, Kieran O'Connor, and J. Mark Dungan for Travelers, and Christopher J. Payne, a rebuttal expert for ZP. Neither party in this case question the experts' qualifications but rather both take issue with the substance of each expert's testimony for various reasons.

### 1.    Haagenson's Expert Reports

Sam Haagenson,[3] Travelers' first expert, provides an analysis of industry-standard construction administration procedures, ZP's implementation of these procedures, perceived deficiencies resulting from ZP's administration, as well as alleged compensation he believes Travelers is due from ZP. ZP Mem. Ex. 1 ("Haagenson Report") (ECF No. 229-1, at 6). In his initial report, Haagenson opines on the following: (1) the typical role of an architect during construction administration—including the industry best practice[4] of directly overseeing construction site observations, evaluating progress payment applications to ensure the amount requested is accurate, and administering change orders to construction contract documents—where

---

[3] Haagenson is a certified architect licensed in multiple states and serves as the Managing Director at Ankura Consulting Group, LLC, with over twenty years of experience in the construction industry. Haagenson Report (ECF No. 229-1, at 10).

[4] Haagenson relies on standards from the American Institute of Architects and the Construction Specifications Institute. Id. at 13, 16-22.

Haagenson ultimately concludes that ZP erroneously deprived the architect of its role administering the Construction Contract, id. at 16-22; (2) ZP's construction contract administration process—which ultimately resulted in Haagenson comparing ZP's actions to industry standards and concluding that ZP failed to adequately carry out the aforementioned responsibilities primarily held by an architect,[5] id. at 24-32; (3) the impacts of ZP's contract administration failures, which included deficient work, inappropriate payments, and delays,[6] id. at 34-51; and (4) the compensation and compensatory damages Travelers is entitled to from ZP,[7] id. at 58-66. Haagenson produced another report[8] in which he rebuts Payne's expert report and opines that ZP was not qualified to perform contract administration tasks. ZP Mem. Ex. 3 ("Haagenson Rebuttal Report") (ECF No. 229-3). Haagenson also opines that ZP had to consider Travelers' interests while administering the Construction Contract, id. at 8, 10-12, and had to protect contract funds and ensure proper payments were made to the contractor, id. at 8, 12-16.

### 2. O'Connor's Expert Report

Kieran O'Connor,[9] Travelers' second expert, analyzes ZP's duties and responsibilities as it relates to construction administration. ZP Mem. Ex. D ("O'Connor Report"), at 4 (ECF 229-4,

---

[5] Haagenson concludes that the Construction Contract still allows for an architect's involvement, comparable to industry standards, but also places further authority in ZP. Id. at 24, 26.

[6] Specifically, Haagenson attributes the following failures to ZP: (1) "insufficient oversight of Huffman's construction activities," resulting in significant deficiencies; (2) "disbursement of inappropriate payments to Huffman for contractually noncompliant work," reducing the available funds to pay Travelers for completing the Project; (3) delays to Travelers' ability to resume work; and (4) continued noncompliant work, resulting in "reverse progress" and requiring Travelers to remove work in place and increase costs to complete the Project. Id. at 13-14, 34-51.

[7] Because ZP authorized payments in violation of the Construction Contract, Haagenson opines that ZP reduced available contract funds and thus is responsible for compensating Travelers for the overpayments made to Huffman. Id. at 14, 58-66. He also opines that "ZP is liable for compensating Travelers for changes to the scope of work" as per the Construction Contract and Performance Bond. Id. In terms of making payments, Haagenson concludes that Travelers is not responsible for damages caused by delays because ZP's contract administration resulted in the delays. Id.

[8] Haagenson's second report rebuts two of ZP's experts—Kevin Coyne and Christopher J. Payne. Haagenson Rebuttal Report (ECF No. 229-3). For the purposes of ZP's motion in this Opinion, Haagenson's rebuttal report as it pertains to Coyne is not at issue. However, Haagenson's rebuttal to Payne's opinion is a point of contention as ZP contends that the rebuttal impermissibly includes legal conclusions. See ZP Mem., at 15 (ECF No. 229, at 21).

[9] O'Connor is a licensed project management professional, serving as the Vice President of Beacon Consulting Group, Inc., with over thirteen years of experience in the construction industry. O'Connor Report, at 4 (ECF No. 229-4, at 5).

at 5). Like Haagenson, O'Connor concludes that by limiting tasks assigned to the architect, ZP assumed "primary responsibility for [c]onstruction [a]dministration for the Project." Id. at 6, 8-13 (ECF No. 229-4, at 7, 9-14). After comparing work ZP performed to industry standards for contract administration, O'Connor opines that ZP (1) inadequately oversaw work during site inspections, which resulted in deficiencies that went unidentified or undocumented in a timely manner; (2) overlooked defective work during review of payment applications, which resulted in overpayments to Huffman; and (3) failed to independently review and administer the change management process in a timely manner. Id. at 6, 13-15, 18-13 (ECF No. 229-4, at 7, 14-16, 19-24). His report highlights that third-party experts identified "[a] significant number of construction deficiencies" that ZP should have identified but failed to, including (1) deficiencies "related to the weather resistive barrier, windows, and cladding" identified by Moisture Intrusion Solutions ("MIS"); (2) structural framing issues identified by ECS Mid-Atlantic, LLC ("ECS") and Woods Engineering; and (3) electrical issues identified by IE Jordan. Id. at 6, 16-17 (ECF No. 229-4, at 7, 17-18). Ultimately, O'Connor opines that ZP failed to carry out the duties it undertook as the construction contract administrator. Id. at 6 (ECF No. 229-4, at 7).

### 3. Dungan's Expert Reports

J. Mark Dungan,[10] Travelers' third expert, offers his opinion on Travelers' "counterclaims for overpayment of the surety's obligations." ZP Mem. Ex. F ("Dungan Report"), at 1 (ECF No. 229-6, at 6). Dungan supports his report by first analyzing Huffman's billings, documentation of non-compliant work, and owner payments, then analyzing events and costs during the transition to Travelers' takeover, and then finally analyzing the cause of additional completion costs. Id. at 4-13 (ECF No. 229-9, at 9-18). Dungan concludes: (1) ZP took on the responsibility of inspecting

---

[10] Dungan is a former construction manager that co-founded Delta Consulting Group, Inc. and now serves on its Advisory Board. See Dungan Report, at 40 (ECF No. 229-6, at 45).

construction work rather than having the architect of the Project perform inspections, but ZP failed to identify defective work, id. at 13-16 (ECF No. 229-9, at 18-21); (2) third-party inspectors— ECS and MIS—documented an extensive amount of defective work, and rather than saving contract funds to correct the deficiencies, ZP overpaid Huffman in excess of $10 million for non-compliant work, id. at 16-32 (ECF No. 229-9, at 21-37); and (3) Travelers incurred $11,382,724 in excess costs of the remaining contract funds as a result of completing rework to correct deficiencies and complete the Project, id. at 37-40 (ECF No. 229-9, at 42-45). Throughout his report, Dungan provides a numerical quantification of the payment, and overpayment, values he discusses based on his review of the contract record.

Dungan's second report rebuts ZP's expert Kevin Coyne's assessment of the Project delays and related damages. ZP Mem. Ex. K ("Dungan Rebuttal Report"), at 1 (ECF No. 229-11, at 6). Dungan highlights the lack of "concurrent delay" analysis in Coyne's report, which is based on Coyne's assumption that ZP did not contribute to any delays, overlooking analysis of ZP's choice to self-inspect construction progress. Id. at 2, 18-35 (ECF No. 229-11, at 23-40). Dungan ultimately opines that Coyne's report does not use an accepted industry standard methodology of review for schedule delay experts such as the Association for the Advancement of Cost Engineering International's ("AACE") recommended practice. Id. at 3-9 (ECF No. 229-11, at 8-14). Thus, Dungan concludes that "the Coyne Report is not a valid independent expert report and the opinions expressed therein are not reliable." Id. at 3 (ECF No. 229-11, at 8).

### 4. Payne's Expert Report

Christopher J. Payne,[11] ZP's rebuttal expert, responds to Travelers' experts' reports,

---

[11] Payne, a "registered professional engineer in five states" with nearly forty years of professional experience "managing construction projects," and "analyzing the performance of construction contractors," provides his opinion on behalf of MBP Carolinas, Inc. Payne Report, at 7 (ECF No. 223-1, at 9).

particularly the allegations that "ZP failed to administer the construction contract . . . and overpaid Huffman prior to termination." Travelers FRE 702 Mem. Ex. A ("Payne Rebuttal Report"), at 1 (ECF No. 223-1, at 3). Rather than respond to each report individually, Payne organizes his rebuttal report to respond to Travelers' experts topically since he contends that their reports significantly overlap on the topics covered. Id. at 11 (ECF No. 223-1, at 13). Payne opines that "ZP owed no special obligation to Travelers," because Huffman failed ZP and, as the surety, Travelers was required to protect ZP in case of Huffman's failure. Id. at 4, 11-15 (ECF No. 223-1, at 6, 13-17). With regard to "ZP's decision to limit the architect's role and assume contract administration duties," Payne claims that ZP took a reasonable approach "consistent with industry norms for sophisticated developers," especially since it was supplemented with third-party inspections. Id. at 5, 20-27 (ECF No. 223-1, at 7, 22-29). Additionally, Payne rebuts Travelers' experts' criticism of ZP's delayed identification of deficiencies in the completed work because there are "no industry standards requiring earlier identification of defects," and because ZP hired MIS, ECS, and Woods Engineering to perform independent inspections. Id. at 5, 25-27 (ECF No. 223-1, at 7, 27-29). As for ZP's payment practices, Payne opines that ZP, with its qualified representative, made reasoned reductions by a little over $3 million to Huffman's payment applications, and only made payments to "maintain progress, . . . not to reward defective work." Id. at 5, 28-35 (ECF No. 223-1, at 7, 30-37). Payne also rebuts Dungan's rework cost estimates by contending that his estimate is based on unsound methodology that "failed to account for differences in scope, market conditions, and actual invoice data," and that his estimate ultimately "overstates rework by roughly a factor of two." Id. at 5-6, 36-38 (ECF No. 223-1, at 7-8, 38-40).

## II.    STANDARD OF REVIEW

In determining the admissibility of expert witness testimony, Rule 702 of the Federal Rules of Evidence governs.  United States v. Wilson, 484 F.3d 267, 274-75 (4th Cir. 2007).  Under the Rule:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.  In other words, expert testimony is admissible under Rule 702 "if it concerns (1) scientific, technical, or other specialized knowledge that (2) will aid the jury or other trier of fact to understand or resolve a fact at issue."  Westberry v. Gislaved Gummi AB, 178 F.3d 257, 260 (4th Cir. 1999) (citing Daubert v. Merrell Dow Pharm., 509 U.S. 579, 592 (1993)).

The first prong requires the court to examine "whether the reasoning or methodology underlying the expert's proffered opinion is reliable" and the second prong asks the court to analyze "whether the opinion is relevant to the facts at issue."  Id.; see also Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999) ("[T]he Federal Rules of Evidence 'assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" (quoting Daubert, 509 U.S. at 597)); Oglesby v. General Motors Corp., 190 F.3d 244, 249-50 (4th Cir. 1999) ("[A] district judge, considering a proffer of expert testimony under Federal Rule of Evidence 702—whether based on scientific, technical, or other knowledge—must, in determining its admissibility, ensure that the evidence is 'not only relevant,

9

but reliable'" (quoting Daubert, 509 U.S. at 589)). That is, "a reliable expert opinion must be based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods." Oglesby, 190 F.3d at 250 (citing Daubert, 509 U.S. at 590, 592-93). "The proponent of the testimony must establish its admissibility by a preponderance of proof." Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199 (4th Cir. 2001) (citing Daubert, 509 U.S. at 592 n.10).

Thus, the District Court serves as a gatekeeper to assess whether the proffered evidence is reliable and relevant. Kumho Tire Co., 526 U.S. at 141. But the gatekeeper function does not require that the Court "determine that the proffered expert testimony is irrefutable or certainly correct" because expert testimony is "subject to testing by 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" United States v. Moreland, 437 F.3d 424, 431 (4th Cir. 2006) (quoting Daubert, 509 U.S. at 596). There is no "mechanistic test for determining the reliability of an expert's proffered testimony; on the contrary, 'the test of reliability is flexible and the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination.'" Peters-Martin v. Navistar Int. Trans. Corp., 410 F. App'x 612, 617 (4th Cir. 2011) (quoting Wilson, 484 F.3d at 274) (internal citations and quotations omitted).

In this case, the experts for both ZP and Travelers do not offer scientific testimony, but rather experiential. The text of Rule 702 explicitly contemplates experiential experts. Fed. R. Evid. 702 (listing "experience" as an expert qualification"); see also Fed. R. Evid. 702 advisory committee's note ("Nothing in this amendment is intended to suggest that experience alone—or experience in conjunction with other knowledge, skill, training or education—may not provide a sufficient foundation for expert testimony."). "Purely scientific testimony . . . is characterized by

'its falsifiability, or refutability, or testability.'" Wilson, 484 F.3d at 274 (quoting Daubert, 509 U.S. at 593). But experiential expert testimony does not "rely on anything like a scientific method," causing the district court's role in "examining the reliability of experiential expert testimony" to become "somewhat more opaque." Id. (citing Fed. R. Evid. 702 advisory committee's note). Nevertheless, the court's gatekeeping role "is to 'make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 200 (4th Cir. 2001) (citing Kumho Tire, Co., 526 U.S. at 152). Therefore, courts must still require an experiential expert to "explain how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the facts." Wilson, 484 F.3d at 274 (quoting Fed. R. Evid. 702 advisory committee's note) (alterations in original).

### III.    ANALYSIS

In these motions, both parties take issue with the substance of each expert's report, not the expert's qualifications. In addition to expert specific arguments, both parties have similar central arguments under the Daubert relevancy and reliability requirements of expert testimony. They agree, for example, that experts may not interpret the contracts at issue—particularly by relying on industry standards to replace or modify the contract terms. Likewise, they all purport to concede that no expert should opine that the parties breached those contracts. Finally, both ZP and Travelers recognize that expert testimony needs to be supported by a reliable methodology. Despite this wide agreement on the boundaries of relevant and helpful testimony, both sides claim the other's experts have strayed far from those recognized limits. As such, this Opinion first addresses the Daubert deficiencies argued by both parties before resolving any reasons to exclude

that do not fall under Daubert. After reviewing the reports and cited testimony in detail, it is clear that each expert crosses the line on occasion, and such testimony should be excluded (or not elicited in the first instance). But it is equally clear that these well credentialed professionals can help clarify the byzantine record of progress reports, pay applications, and progress payments that inform the parties' agreement. Rather than parse through each report to identify every impermissible statement, this Opinion provides guardrails for each experts' opinion to clarify the limits of an expert's testimony that the court expects the parties to abide by when the experts at issue testify.

**A.    The Parties' Experts Should Not Offer Irrelevant Evidence That Is Not Helpful to the Trier of Fact**

**1.    Each Expert Offers Some Inadmissible Contract Interpretation That Should Be Excluded**

ZP argues that Travelers' experts offer legal conclusions interpreting the contracts at issue—the Construction Contract, the Performance Bond, and the Takeover Agreement ("Contract Documents")—and opining on their breach. ZP Mem., at 6 (ECF No. 229, at 12); Mem. P. & A. Further Supp. ZP's Mot. Exclude Test. ("ZP Reply"), at 1 (ECF No. 267, at 5). Travelers concedes these legal documents inform the experts' testimony, but argues that "[c]onstruction contract administration, surety bond claims administration, and completing a terminated project are all specialized practices in the construction and surety industries" where the jury would benefit from expert testimony. Travelers' Resp. ZP's Mot. Exclude Test. ("Travelers Opp'n"), at 1, 4 (ECF No. 245, at 5, 8). By contrast, Travelers argues ZP's expert Payne impermissibly opines on the parties' legal duties owed to each other by interpreting provisions of the same three Contract Documents and offering legal conclusions that are irrelevant. Travelers FRE 702 Opinion, at 5 (ECF No. 223, at 9) (citing Payne Rebuttal Report, at 15 (ECF No. 223-1, at 17)). Although discussing relevant

contract documents is helpful for a jury to understand the construction and surety industries, the parties' experts may not interpret contract provisions to make legal conclusions and determine legal duties.

"[O]pinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible." United States v. McIver, 470 F.3d 550, 562 (4th Cir. 2006). Experts may opine on the "ordinary practices of those engaged in [a particular] business." Adalman v. Baker, Watts & Co., 807 F.2d 359, 367 (4th Cir. 1986), abrogated on other grounds by Pinter v. Dahl, 486 U.S. 622 (1988). But experts may not "constru[e] a document for its legal effect." Id. (quoting Marx & Co. v. Diners' Club Inc., 550 F.2d 505, 512 (2d Cir. 1977)). "Specifically, the Fourth Circuit has found that whether a party breached a contract, as well as the proper interpretation of a contract, are 'question[s] of law,' and an expert cannot give an opinion as to the legal obligations of parties under a contract." Donnert v. Feld Entertainment, Inc., No. 1:13-cv-40, 2013 WL 12097618, at *3 (E.D. Va. Nov. 8, 2013) (quoting Forrest Creek Associates, Ltd. v. McLean Sav. & Loan Ass'n, 831 F.2d 1238, 1242 (4th Cir. 1987)); E. Claiborne Robins Co. v. Teva Pharm. Indus., Ltd, No. 3:18-cv-827, 2022 WL 3710758, at *3 (E.D. Va. Feb. 23, 2022).

Occasionally, testimony that states a legal conclusion is permissible in "complex and highly technical cases." Brainchild Surgical Devices, LLC v. CPA Glob. Ltd., 144 F.4th 238, 254 (4th Cir. 2025); see, e.g., United States v. Barile, 286 F.3d 749, 760 n.7 (4th Cir. 2002) ("[A legal conclusion] may be helpful if the case involves a specialized industry such as insurance." (quoting Weinstein's Federal Evidence § 704.04[2][a] (2d ed. 2001))); United States v. Offill, 666 F.3d 168, 175 (4th Cir. 2011) ("We conclude that the specialized nature of the legal regimes involved in this case and the complex concepts involving securities registration, registration exemptions, and

specific regulatory practices make it a typical case for allowing expert testimony that arguably states a legal conclusion in order to assist the jury."); Romeo v. Antero Resources Corp., 1:17CV88, 2021 WL 215494, at *3-4 (N.D. W. Va. Jan. 21, 2021) (preventing an expert from opining on the interpretation of the royalty provisions in the Class Leases, but allowing him to "explain terms of art in the oil and gas industry, and to describe certain customs and usage within that industry, [as] such testimony [would] aid the jury's understanding of a complex industry and is admissible"). "The best way to determine whether opinion testimony contains legal conclusions, 'is to determine whether the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular.'" Barile, 286 F.3d at 760–61 (quoting Torres v. Cnty. of Oakland, 758 F.2d 147, 151 (6th Cir. 1985)).  When an expert's testimony turns on the meaning of contract terms, it is an inadmissible legal conclusion.  See Brainchild Surgical Devices, LLC, 144 F.4th at 254.

Here, much of the expert testimony at issue would be helpful to a jury by assisting them in understanding the construction and surety industries, the relationship of the three parties, as well as the ordinary process of administering a complex multi-year construction effort involving many different subcontractors.  But each expert's report also includes some overt legal conclusions that should be excluded (or not elicited in the first instance).  Some examples of impermissible legal conclusions in each of the experts' reports will illustrate the point.  The general guardrails within this court's Opinion and the examples it provides should be sufficient for the parties to manage the testimony offered.

For Travelers' expert, Haagenson's report opines that ZP's payments to Huffman are a "clear violation of the Contract Documents," Haagenson Report, at 8 (ECF No. 229-1), which is an impermissible legal conclusion regarding breach of contract.  See Donnert, 2013 WL 12097618,

14

at *3.  Additionally, Haagenson's report's conclusion that Travelers is entitled to "compensatory damages" from ZP, Haagenson Report, at 58-66, is another example of an impermissible legal conclusion regarding the parties' liability.  See Donnert, 2013 WL 12097618, at *3.  Similarly, for O'Connor, portions of his expert report include express contract interpretation that leads to impermissible legal conclusions about the parties' duties to administer the Construction Contract.  O'Connor Report, at 6 (ECF No. 229-4, at 7); see Brainchild Surgical Devices, LLC, 144 F.4[th] at 254.  But some of O'Connor's testimony comparing ZP's performance to industry norms of construction contract administration rather than directly opining on ZP's legal duties is admissible and helpful to the trier of fact.  See Barile, 286 F.3d at 760–61.  Dungan's opinion relies in part on his conclusion that ZP breached contractual obligations.  But Dungan also offers the plain language of the contracts at issue as context for his conclusion, which is within the bounds of expert testimony.  See Adalman v. Baker, Watts & Co., 807 F.2d 359, 367 (4th Cir. 1986).  These examples highlight the type of testimony that would be impermissible for Travelers' experts to make.

For ZP's expert Payne, his report purported to identify an "Owner standard of care" and concludes that "ZP owed no special obligation to Travelers" since it is not required "to protect the future interests of the surety."  Payne Report at 4, 38 (ECF No. 223-1, at 6, 40).  As phrased, both are improper legal conclusions because Payne is opining on the parties' duties under Performance Bond and Construction Contract provisions.  See Donnert, 2013 WL 12097618, at *3.  In fact, Payne stated he was offering his interpretation of the Performance Bond during his deposition.  Travelers FRE 702 Mem. Ex. B ("Payne Dep.") 74:7-15 (ECF No. 223-2, at 12).  In addition, the phrase "Owner standard of care," includes a phrase that has a specialized meaning in law.  See Barile, 286 F.3d at 760–61.  But as with Travelers' experts, Payne offers helpful explanation from

15

the perspective of a sophisticated owner and developer of multi-family properties that is rooted in his experience and well supported by the documents and the evidence he relied on.  Rather than excluding Payne's opinion entirely, he must testify without offering legal conclusions.

### 2.    The Experts Appropriately Testify About Industry Standards Without Opining on Legal Duties Generally and Should Not Be Excluded Entirely

ZP contends that expert testimony on industry standards is impermissible in this case because the Construction Contract governs. ZP Mem., at 13 (ECF No. 229, at 19).  Specific to Travelers' experts, ZP argues that all three invoke industry standards to conclude that ZP violated them.  Id.  Although Travelers concedes that industry standards do not trump contract terms, it argues that knowledge of industry standards is helpful for a jury to understand the requirements of the Construction Contract or Performance Bond because "contract terms sometimes can be explained only in the context of industry standards."  Travelers Opp'n, at 10 (ECF No. 245, at 14). ZP replies that the Construction Contract and Performance Bond have to be ambiguous for Travelers' experts to testify on industry standards, and that in this case, both documents are unambiguous.  ZP Reply, at 6 (ECF No. 267, at 10).

Travelers makes a nearly identical argument to exclude Payne's testimony.  Specifically, Travelers contends that not only did Payne rely on industry standards to interpret the Contract Documents, but he also creates a separate industry standard of care—one that is not premised on any legal authority—"to supplant the plain language of the Contract and Performance Bond." Travelers FRE 702 Mem., at 9 (ECF No. 223, at 13).  For its part, ZP argues that Payne did not create a new standard of care, but rather appropriately applied a recognized nationwide standard to help the jury understand the contract documents.  ZP FRE 702 Opp'n, at 4.  Given the complexities of the construction and surety industries, expert testimony on industry standards is

helpful to a jury and is permissible so long as the experts refrain from opining on legal duties under the Contract Documents in this case.

Courts may allow an expert to testify regarding industry standards if such an explanation would be helpful to the trier of fact. See, e.g., Romeo v. Antero Resources Corp., 1:17-cv-88, 2021 WL 215494, at *3-4 (N.D. W. Va. Jan. 21, 2021); Hopeman Bros., Inc. v. Cont'l Cas. Co., No. 4:16-cv-187, 2018 WL 4169282, at *14 (E.D. Va. Jan. 12, 2018) (allowing expert testimony "regarding general customs, practices, and standards of the insurance industry"); Berckeley Inv. Group, Ltd. v. Colkitt, 455 F. 3d 195, 217-18 (3d Cir. 2006) (allowing an expert to testify as to "customs and business practices in the securities industry," but not whether the defendant "complied with legal duties that arose under the federal securities laws"). Similarly, "[w]ithin the context of a breach of contract claim, courts 'may allow an expert to testify regarding industry custom and usage when such explanation would be helpful to the jury.'" In re Randolph Hosp., Inc., No. 20-10247, 2024 WL 380701, at *6 (Bankr. M.D.N.C. Jan. 29, 2024) (quoting Carlisle v. Allianz Life Ins. Co. of N. Am., No. 2:19C-cv-565, 2021 WL 5104703, at *7 (E.D. Va. Sept. 13, 2021) (collecting cases)).

In this case, both Travelers' and ZP's experts appropriately opine on industry standards to help the jury understand nuances of the construction and surety industries from their clients' perspective. For example, Haagenson refers to industry standards from the American Institute of Architects ("AIA") and the Construction Specifications Institute ("CSI") in his expert report. Haagenson Report, at 9. Similarly, O'Connor confirmed that he relied on the Project Management Institute ("PMI") standards in his report. O'Connor Report, at 4 (ECF 229-4, at 5); ZP Mem. Ex. E ("O'Connor Dep.") 35:7-42:8 (ECF No. 229-5, at 7-14). Dungan does cite to any recognized industry standards, but he does rely on his own industry experience and the Contract Documents.

17

See Dungan Report (ECF No.229-6). ZP's expert Payne also relies on standards from AIA's model contracts. Payne Rebuttal Report, at 21, 38 (ECF No. 23, 40). Although the Construction Contract does not refer to these standards, it is helpful to include these experts' testimony since they may assist a jury in understanding the complex industry norms. For example, the Construction Contract often refers to the phrase "reasonably inferable" in connection to the performance of work without defining what that phrase means. Construction Contract § 1.2.2 (ECF No. 62-1, at 54-55) ("Work not covered in the Contract Documents will not be required unless it is consistent therewith and is reasonably inferable therefrom as being necessary to produce the intended results."). In those instances, expert testimony about industry norms would be helpful. Additionally, the Construction Contract itself refers to industry standards, and in that context, expert testimony regarding industry standards would be helpful as well. Id. § 4.2.4 (ECF No. 62-1, at 64) ("Contractor shall develop and implement a system and procedures for reviewing its own Work . . . in accordance with industry standards."); see also Romeo v. Antero Resources Corp., 1:17-cv-88, 2021 WL 215494, at *3-4 (N.D. W. Va. Jan. 21, 2021).

However, both parties' experts should refrain from taking that helpful testimony too far and applying it to opine on the parties' legal duties under the Contract Documents. For example, Haagenson may explain why industry standards assign inspection duties to the architect, but he should not testify at trial that the Construction Contract "violates" industry standards in allowing ZP to retain some of those duties. ZP Mem. Ex. B ("Haagenson Dep.") 132:7-23 (ECF No. 229-2, at 21). As long as the experts do not testify to the parties' legal duties by attempting to supplant industry standards in place of the contract documents,[12] the experts may refer to industry standards in their testimony. See Romeo, 2021 WL 215494, at *3-4.

---

[12] All four experts at issue are aware that the Contract Documents for this project govern. See, e.g., Haagenson Report, at 13 (concluding that the administrator of the contract must "ensure that the project is built in conformance with the

**3.    Travelers' Experts Refer to Events Knowable by ZP, but Do Not Opine on ZP's Knowledge, Intent, or State of Mind**

ZP contends that Travelers intends to ask its experts to opine on ZP's knowledge, intent, and state of mind to help determine whether ZP's actions were proper. ZP Mem., at 16-17 (ECF No. 229, at 22-23). By way of example, ZP claims Haagenson opines on ZP's awareness of non-compliant work and O'Connor opines on ZP's lack of construction knowledge. Id. at 17-18 (ECF No. 229, at 23-24). Travelers, however, argues that its experts are not offering opinions on ZP's knowledge, intentions, or state of mind, but rather rely on materials like Project documents and inspector reports to testify about information available to and therefore knowable by ZP, which is useful to the factfinder. Travelers Opp'n, at 14-15 (ECF No. 245, at 18-19).

"While an expert may testify as to a review of internal corporate documents solely for the purpose of explaining the basis for his or her opinions—assuming the opinions are otherwise admissible—[an expert's] knowledge, state of mind, alleged bad acts, failures to act, or other matters related to corporate conduct and ethics are not appropriate subjects of expert testimony because opinions on these matters will not assist the jury." In re C.R. Bard, Inc., 948 F. Supp. 2d 589, 611 (S.D. W. Va. 2013); Tyree v. Bos. Sci. Corp., 54 F. Supp. 3d 501, 518 (S.D. W. Va. 2014). "The reasonableness of conduct and a party's then-existing state of mind are the sort of questions that lay jurors have been answering without expert assistance from time immemorial." City of Huntington v. AmerisourceBergen Drug Corp., No. 3:17-01362, 2021 WL 1320716, at *1–2 (S.D. W. Va. Apr. 8, 2021) (quoting Tyree, 54 F. Supp.3d at 564).

The facts of In re C.R. Bard, Inc. and the court's decision to exclude expert testimony in that case are different from the Travelers' experts' testimony that ZP seeks to exclude. In that

---

design intent and the Contract Documents"); Payne Dep. 67:21-68:7 (ECF No. 223-2, at 8-9) ("[F]or an owner's standard of care in the construction administration process . . . the most relevant benchmark would be what the contract states.").

case, the expert at issue spent nearly forty pages opining on the plaintiff's knowledge and state of mind. In re C.R. Bard, Inc., 948 F. Supp. 2d 589, 611 (S.D. W. Va. 2013) (providing the title of a section that stated the plaintiff "seems to lack concern for individual woman's health and safety" as one example). Here, Travelers' experts may not expressly testify to ZP's knowledge but may point out deficiencies in the Project and evidence of those deficiencies in the Project documents themselves. For example, Haagenson's opinion that "ZP permitted construction activities to continue despite awareness of severely noncompliant work" is not a determination of ZP's knowledge of defects if the documentary record or other evidence establishes ZP's knowledge. Haagenson Report, at 13. Rather, Haagenson offers this opinion to explain how the continuation of deficient work led Travelers to remove work already done, ultimately increasing their costs to complete the Project. Id. Similarly, O'Connor's opinion is not about ZP's lack of construction knowledge but rather states that "a large number of observable deficiencies were not reported until third party inspections were requested," and opines that this may have been due to a variety of reasons including "infrequent visits, insufficient construction knowledge, or a failure to adequately review the work when on-site." O'Connor Report, at 15 (ECF No. 229-4, at 16). O'Connor's opinion was based on inspector reports and his expert understanding of the processes and procedures generally followed during contract administration. Id. at 16 (ECF No. 229-4, at 17). Thus, Travelers' experts are providing the basis for their opinions after reviewing the Project documents, which includes information known or knowable by ZP, and are not opining on ZP's knowledge, intent, or state of mind.

.

**B.    The Parties' Experts Offer Opinions Based on Reliable Methodology**

   **1.    Most of the Experts' Opinions Are Not *Ipse Dixit* and Permissibly Rely on Industry Experience**

   ZP argues that all three of Travelers' experts do not have a discernable methodology in reaching their conclusions because each report was based on the experts' experiences, and thus each expert offers unreliable testimony that is "nothing more than *ipse dixit*." ZP Mem., at 18-19 (ECF No. 229, at 24-25).  Travelers responds that its experts—relying on contract documents, project reports, industry standards, deposition transcripts, and inspection reports alongside their own experience and expertise—provide adequate and reliable testimony.  Travelers Opp'n, at 16 (ECF No. 245, at 20).  On the other hand, Travelers argues that Payne provides "litigation-driven conclusions" that are not based on "any established industry practice or accepted methodology," and that the court should similarly exclude such testimony for being unreliable.  Travelers FRE 702 Mem., at 2 (ECF No. 223, at 6).[13]  Both parties' experts are permitted to rely on their expertise and specialized knowledge of the construction industry, alongside relevant Project documents and industry standards, for their testimony.

   To determine reliability of an experiential expert, the question is whether the expert can "explain how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the facts."  United States v. Wilson, 484 F.3d 267, 274 (4th Cir. 2007) (quoting Fed. R. Evid. 702 Advisory Committee Note)

---

[13] Travelers goes as far as deeming Payne a "hired gun" for ZP that provides a one-sided rebuttal to Travelers' experts without performing "expert analysis of his own." Travelers FRE 702 Mem., at 9-11 (ECF No. 223, at 13-15).  ZP disagrees that Payne is a "hired gun" since his credentials and experience demonstrate that he is a reliable expert and not a "litigation mouthpiece."  ZP FRE 702 Opp'n, at 8.  The Fourth Circuit has expressed concern about experts acting as "hired guns," Brown v. Comm'r Soc. Sec. Admin., 873 F.3d 251, 271 n. 6 (4th Cir. 2017), since an expert cannot be "a hired gun who 'merely express[es] the opinions of the lawyers who hired' her."  Howard v. City of Durham, No. 1:17-cv-477, 2021 WL 5086379, at *12 (M.D.N.C. Nov. 2, 2021) (quoting Trigon Ins. Co. v. United States, 204 F.R.D. 277, 294 (E.D. Va. 2001)).  However, by relying on Project documents, industry standards, and his forty years of experience, Payne demonstrates he is not a hired gun but rather is a reliable expert.

(alterations in original); see also Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199-200 (4th Cir. 2001) (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150, 152 (1999)). "[A] trial court has 'broad latitude' to determine whether these factors are 'reasonable measures of reliability in a particular case.'" Nease v. Ford Motor Co., 848 F.3d 219, 229 (4th Cir. 2017) (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 153 (1999)). However, "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit*[14] of the expert," especially if there is "too great an analytical gap between the data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). Testimony based on "experience and education in the industry . . . . provide adequate and reliable grounds" for expert opinions, and "do not amount to mere speculation" or *ipse dixit*. US Wind Inc. v. InterMoor, Inc., 640 F. Supp. 3d 390, 407 (D. Md. 2022).

Here, Travelers' experts have relevant experience and education in the construction industry they may rely on to provide opinions about the claims at issue. As discussed earlier though, all of Travelers' experts also permissibly discuss Project documents and rely on industry standards to inform their testimony. See supra pp. 16-19. Such opinions are not *ipse dixit*. See US Wind Inc., 640 F. Supp. 3d at 407.

Similarly, Payne's expert report considers an extensive record to support his opinions, including "[c]ontract documents, daily reports, meeting minutes, available correspondence, project schedules, change order requests . . . and change orders . . ., payment applications, emails, and legal pleadings," as well as interviews and third-party inspection reports regarding the Project. Payne Rebuttal Report, at 1, 11 (ECF No. 223-1, at 3, 13). For example, Payne uses the record to

---

[14] "*Ipse dixit* is translated as "[h]e himself said it," and defined as "a bare assertion resting on the authority of an individual." Casey v. Geek Squad Subsidiary Best Buy Stores, L.P., 823 F. Supp. 2d 334, 341 n. 4 (D. Md. 2011) (quoting Black's Law Dictionary 961 (4th ed. 1951)).

test Dungan's quantification of rework costs. He highlights that Dungan's estimate double-counted items, ignored invoice data, and ultimately overstated costs. Id. at 36-38 (ECF No. 223-1, at 38-40). In addition to a review of these documents, Payne's opinion draws from his education and forty years of professional experience, id. at 7 (ECF No. 223-1, at 9), which are also permissible bases for his expert opinions. See US Wind Inc., 640 F. Supp. 3d at 407.

### 2.    Factual Disagreements with the Experts' Should Be Resolved Through Cross-Examination, Not Exclusion

ZP argues that each of Travelers' experts is unreliable because their opinions conflict with the Construction Contract, advancing factually incorrect opinions. ZP Mem., at 18-19 (ECF No. 229, at 24-25); ZP Reply, at 10-11 (ECF No. 267, at 14-15). Travelers contends that by relying on an extensive record, any disputes about the accuracy of facts and data within an expert report go toward the weight and credibility of evidence, not its admissibility. Travelers Opp'n, at 17 (ECF No. 245, at 21). Travelers takes issue with Payne's expert report for its alleged failure to consider controlling law in Virginia, specifically the decision that payment provisions of a building contract are generally considered "covenants for the benefit of the surety" in Southwood Builders, Inc. v. Peerless Ins. Co., 235 Va. 164, 170 n* (1988). Travelers FRE 702 Mem., at 8 (ECF No. 223, at 12). ZP distinguished the merits of that case with the case at hand and argues that the holding in Southwood Builders does not have implications for a Daubert motion, and thus should not serve as the basis for excluding Payne's opinion. ZP FRE 702 Opp'n, at 6-7.

When there are factual disagreements or conflicting expert opinions, "[t]he standard for exclusion is whether [an expert] 'speculate[s] in fashions unsupported by ... the uncontroverted evidence in the case.'" BAE Sys. Norfolk Ship Repair, Inc. v. United States, No. 2:22-cv-230, 2024 WL 1057773, at *4 (E.D. Va. Feb. 23, 2024) (quoting Newman v. Hy-Way Heat Sys., Inc., 789 F.2d 269, 270 (4th Cir. 1986)). "'[Q]uestions regarding the factual underpinnings of the

[expert witness'] opinion affect the weight and credibility' of the witness' assessment, 'not its admissibility.'" Bresler v. Wilmington Tr. Co., 855 F.3d 178, 195 (4th Cir. 2017) (quoting Structural Polymer Grp. v. Zoltek Corp., 543 F.3d 987, 997 (8th Cir. 2008)); see also Globus Med., Inc. v. Jamison, No. 2:22-cv-282, 2024 WL 4711947, at *7 (E.D. Va. Nov. 7, 2024) ("Perceived flaws in the factual basis of the expert's report and testimony go to the weight, not the admissibility, of that testimony."). Comments to the Federal Rules of Evidence clarify that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Fed. R. Evid. 702 (advisory committee's notes to 2000 Amendment); see Atl. Coast Pipeline, LLC v. 0.07 Acre, More or Less, in Nelson Cnty., Virginia, 396 F. Supp. 3d 628, 640 (W.D. Va. 2019).

Here, the disputes about the accuracy of facts and data within Travelers' expert reports go toward the weight and credibility of evidence, not its admissibility. See Bresler, 855 F.3d at 195. As such, ZP should address its concerns through cross-examination at trial. See Fed. R. Evid. 702. Similarly, although Payne stated in his deposition that he did not take into account the Southwood Builders decision when writing his report, Payne Dep. 78:12-16 (ECF No. 223-2, at 16) ("[The Southwood Builders' decision] was not something I took into account per se."), that does not mean that his entire testimony is unreliable and should be excluded. Rather, any shortcomings of his report in this regard also go toward the weight and credibility of evidence, not its admissibility. See Bresler, 855 F.3d at 195.

## C. Travelers Has Not Called on All Three Experts to Offer Cumulative Expert Testimony and Exclusion of Its Experts Before Trial Would Be Premature

ZP contends that Travelers' three experts "intend to present testimony from similar if not the same disciplines" to opine on contract administration, and that this is inadmissible "cumulative and duplicative testimony." ZP Mem., at 24 (ECF 229, at 30). ZP only has one expert to rebut

all of Travelers' experts, which ZP claims demonstrates how much overlap exists amongst Travelers' experts. ZP Reply, at 12 (ECF No. 267, at 16). As such, ZP requests that the court order Travelers to offer only one expert per discipline and exclude other expert testimony. ZP Mem., at 25 (ECF. No. 229, at 31). There is indeed significant overlap among Travelers' experts' reports, but excluding experts for cumulative testimony is premature and should instead be adjudicated during trial.

Under the Federal Rules of Evidence, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . needlessly presenting cumulative evidence" among other concerns. Fed. R. Evid. 403. Having "multiple expert witnesses expressing the same opinions on the same subject matter is . . . needlessly cumulative," and during a jury trial, "[l]imiting the number of expert witnesses . . . reduces the unfair possibility that jurors will resolve competing expert testimony by 'counting heads' rather than evaluating the quality and credibility of the testimony." McCann v. Cullinan, No. 11-cv-50125, 2016 WL 4593835, at *2 (N.D. Ill. Sept. 2, 2016), R. & R. adopted sub nom. McCann v. Ogle Cnty., No. 11-c-50125, 2016 WL 5807922 (N.D. Ill. Oct. 5, 2016). However, excluding expert testimony due expert reports overlapping can be "premature because not all of the experts may be called and their testimony has not yet been elicited." Dorman v. Anne Arundel Med. Ctr., No. 15-1102, 2018 WL 2431859, at *3 (D. Md. May 30, 2018), aff'd sub nom. Dorman v. Annapolis OB-GYN Assocs., P.A., 781 F. App'x 136 (4th Cir. 2019); see also Patterson v. Nw. Hosp. Ctr., No. 22-3183, 2025 WL 1068062, at *4 (D. Md. Apr. 9, 2025) (denying a motion in limine to exclude cumulative expert testimony because the defendant did not intend on calling one of the experts at trial, and thus, there was no basis to exclude testimony as unfairly prejudicial under the Federal Rules of Evidence). In

such instances, a motion to exclude needlessly cumulative testimony should be renewed at trial for the court to consider. See Dorman, 2018 WL 2431859, at *3.

Here, Travelers' expert reports have significant overlap, but exclusion would be premature since Travelers may decide not to call on all three experts during trial. See id.; Patterson, 2025 WL 1068062, at *4. The court notes that O'Connor's report is particularly similar to the other two expert reports seemingly without providing any unique opinions. Travelers should be mindful of calling all three of its experts to offer testimony about the same issues at trial because doing so may be needlessly cumulative and may increase the risk of jurors resolving the claims in the case by considering the number of experts testifying, not by the quality of the experts' testimony. See McCann, 2016 WL 4593835, at *2. However, I defer any judgment regarding the cumulativeness argument to the trial judge. Rather than exclude Travelers' experts prematurely, ZP can raise objections to duplicative testimony during trial, and the District Judge, having heard the testimony, will be best positioned to enforce necessary limits.

**D.    Including O'Connor's Report Does Not Prejudice ZP and Does Not Serve as a Basis to Exclude His Expert Report**

ZP argues that O'Connor's "rebuttal report" does not contain a rebuttal but rather "is an untimely attempt to supplement O'Connor's initial expert report," and thus should be excluded. ZP Mem., at 25 (ECF No. 229, at 31). For its untimely argument, ZP contends that, as per the Scheduling Order, the deadline to submit an expert report for the party with the burden of proof was August 8, 2025, and the deadline for rebuttal reports was modified to August 22, 2025. ZP Reply, at 13 (ECF No. 267, at 17); Scheduling Order (ECF No. 47, at 2-3) modified by (ECF No. 163, at 7). O'Connor's Report was filed on August 22, 2025, so if it is an expert rebuttal report, then it was timely filed.

In general, a testifying expert qualifies as either an initial or affirmative expert or a rebuttal expert. An initial expert serves to establish a party's case-in-chief, while a rebuttal expert provides "[e]vidence offered to disprove or contradict the evidence presented by an opposing party." Black's Law Dictionary 702 (11th ed. 2019)); see also United States v. Stitt, 250 F.3d 878, 897 (4th Cir. 2001) ("Rebuttal evidence is defined as '[e]vidence given to explain, repel, counteract, or disprove facts given in evidence by the opposing party. That which tends to explain or contradict or disprove evidence offered by the adverse party.'" (quoting Black's Law Dictionary 1267 (6th ed.1990))). Rebuttal expert reports can offer rebuttal evidence by "cit[ing] new evidence and data so long as the new evidence and data is offered to directly contradict or rebut the opposing party's expert. Funderburk v. S.C. Elec. & Gas. Co., No. 3:15-cv-4660, 2019 WL 3406814, at *4 (D.S.C. July 9, 2019) (quoting Glass Dimensions, Inc. v. State St. Bank & Tr. Co., 290 F.R.D. 11, 16 (D. Mass. 2013)).

Here, it appears O'Connor does not provide a direct rebuttal to any of ZP's experts—which Travelers concedes, Travelers Opp'n, at 20-21 (ECF No. 245, at 24-25), and O'Connor confirms, O'Connor Dep. 12:3-12 (ECF No. 229-5, at 4)—but rather he provides testimony against ZP's allegations as discussed in ZP's experts' reports. For example, O'Connor's report rebuts the subject matter of ZP's experts' reports regarding the costs and damages incurred under the Construction Contract and Performance Bond.[15]  Even if O'Connor's report does meet the requirements of a rebuttal report, ZP had the opportunity to question O'Connor about his report

---

[15] ZP cites to Boles v. United States, where the court held that the expert reports in that case were not rebuttal reports. No. 1:13-cv-489, 2015 WL 1508857, at *3 (M.D.N.C. Apr. 1, 2015). However, the court in that case noted that the expert report in questions did not address any opinions issued by the opposing party's experts and instead discussed the general subject matter of the case. Id.  Here, however, O'Connor's report addresses the same subject matter in ZP's experts' report, including the costs and damaged incurred. See id. at *4

during his deposition, as well as respond with their own additional rebuttal reports, but did not do so. Thus, ZP fails to show any prejudice from admitting O'Connor's expert report.

**E.    Failure to Disclose a Spreadsheet Supporting Payne's Conclusion in Section 3.5 of His Rebuttal Report Is Minimally Harmful and Does Not Require Excluding Testimony from All of Section 3.5**

Travelers also moved to exclude opinions in Section 3.5 of Payne's rebuttal report because Payne did not disclose a spreadsheet he used to analyze invoice data. The calculations from the spreadsheet supported his conclusion that the rework costs in Dungan's report were overstated "by roughly a factor of two." Travelers Section 3.5 Mem. (ECF No. 244, at 2) (citing Payne Rebuttal Report, at 36 (ECF No. 223-1, at 38). Travelers argues that such failure violates Rule 26(a)(2)(B) and that all opinions in Section 3.5 should be excluded under Rule 37(c)(1) of the Federal Rules of Civil Procedure. Id. at 3, 10, 12. ZP, however, contends that the spreadsheet Payne references in his deposition just offers "more granular examples" of Dungan's miscalculation, with analysis Dungan could have done himself based on source documents that were identified and disclosed, and that Travelers overstates the spreadsheet's importance as it is not necessary to support Payne's opinion in Section 3.5 of his report. ZP's Mem. Opp'n Travelers Second Mot. Exclude Expert Test. ("ZP Section 3.5 Opp'n), at 2, 8 (ECF No. 269); Payne Dep. 235:7-236:15 (ECF No. 246-2, at 51). Although a failure to disclose the spreadsheet was not justified, Travelers is not harmed to the extent that Section 3.5 of Payne's Rebuttal Report needs to be entirely excluded.

Under the Federal Rules of Civil Procedure, expert disclosures must include "a complete statement of all opinions the witness will express and the basis and reasons for them," as well as "the facts or data considered by the witness." Fed. R. Civ. P. 26(a)(2)(B). A party who fails to disclose required information under Rule 26(a) "is not allowed to use that information or witness

to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The Fourth Circuit has held that

> Rule 26 disclosures are often the centerpiece of discovery in litigation that uses expert witnesses. A party that fails to provide these disclosures unfairly inhibits its opponent's ability to properly prepare, unnecessarily prolongs litigation, and undermines the district court's management of the case. For this reason, "[w]e give particularly wide latitude to the district court's discretion to issue sanctions under Rule 37(c)(1)."

Saudi v. Northrop Grumman Corp., 427 F.3d 271, 278–79 (4th Cir. 2005) (quoting S. States Rack & Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 595 (4th Cir. 2003)).

"To determine whether the party's failure to properly disclose is substantially justified or harmless, the court is guided by the following factors: (1) the surprise to the party against whom the evidence would be offered; (2) the ability of the offering party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the offering party's explanation for its failure to properly disclose the evidence." Zaklit v. Glob. Linguist Sols., LLC, No. 1:14-cv-314, 2014 WL 4925780, at *2 (E.D. Va. Sept. 30, 2014) (citing Wilkins v. Montgomery, 751 F.3d 214, 222 (4th Cir.2014)). "The burden of establishing these factors lies with the nondisclosing party." Wilkins, 751 F.3d at 222. However, courts are not bound by these factors as they have broad discretion to determine harmlessness. Id.; see also Bresler v. Wilmington Tr. Co., 855 F.3d 178, 194 (4th Cir. 2017) (upholding the denial of a motion to exclude expert testimony because "any surprise to [the party] at trial was minimal, and that [party] had an opportunity to cure any surprise").

Here, although Payne's failure to disclose the spreadsheet was not substantially justified, allowing Payne to testify about Section 3.5 of his Rebuttal Report—with some court-imposed limitations—would render his late disclosure harmless. See Atl. Coast Pipeline, LLC v. 0.07 Acre, More or Less, in Nelson Cnty., Virginia, 396 F. Supp. 3d 628, 638 (W.D. Va. 2019) (denying a

motion to exclude expert testimony under Rule 26(a)(2)(B) even though the expert failed to disclose how line item amounts were calculated in his report because there was sufficient information in the report to avoid harm). Payne's rebuttal report includes specific figures derived from the spreadsheet which are not apparent on the pay applications and then states "[Dungan] ignores the data in the Perini invoices that segregated rework from the base contract work. Based on [a] review of Perini invoices, it is apparent that [Dungan's] rework amount of over $11 million overstates the actual amounts incurred by Perini by roughly a factor of two." Payne Rebuttal Report, at 36 (ECF No. 223-1, at 38). To support this conclusion, Payne provides three examples. Id. at 37 (ECF No. 223-1, at 39). Importantly, the data Payne relied on to prepare the spreadsheet calculation, including all of the Perini pay applications, was provided and identified by him as source material. But Travelers takes issue with the examples Payne provides because they "only add up to the $4.38 million of the $11,382,724.12 priced by Delta," which is not even half the price calculated in Dungan's report. Travelers Section 3.5 Mem., at 4. "Because of ZP's nondisclosure, Travelers [claims it] has lost its opportunity to meaningfully challenge Payne's figures at deposition and in a sur-rebuttal report." Travelers Reply Supp. Mot. Exclude Expert Test. ("Travelers Section 3.5 Reply"), at 7 (ECF No. 270).

During Payne's deposition, Travelers learned of Payne's spreadsheet, and he described his methodology, stating he "went through each Perini application in detail and . . . identified change order work from advancement of contract work by each subcontract and compiled that information." Payne Dep. 214:3-18 (ECF No. 246-2, at 39). Travelers claimed surprise by this information and unprepared to ask any questions regarding the spreadsheet during Payne's deposition, which Payne "appreciate[d]" and tried to rectify by offering to explain the spreadsheet

during the deposition. See Zaklit v. Glob. Linguist Sols., LLC, No. 1:14-cv-314, 2014 WL 4925780, at *2 (E.D. Va. Sept. 30, 2014); Payne Dep. 217:19-218:6 (ECF No. 246-2, at 43).

But most of the opinions in Section 3.5 of Payne's rebuttal attack Dungan's methodology rather than his ultimate conclusions on value. Payne Rebuttal Report, at 36-38 (ECF No. 223-1, at 38-40). As a result, Travelers did not face substantial harm by deposing him without the spreadsheet. And having had the spreadsheet now for weeks, Travelers can tailor its cross-examination accordingly. ZP has agreed that the spreadsheet calculations will not be offered at trial, and allowing Payne to testify from Section 3.5 of his report with certain court-imposed limitations on his testimony would not cause a serious disruption at trial. Here, because most of Section 3.5 of Payne's rebuttal report does not rely upon analysis done in the spreadsheet, Travelers is not prejudiced by Payne's testimony from that section of his report. See Lilly v. Baltimore City Police Dep't, No. 22-2752, 2025 WL 1709856, at *12 (D. Md. June 17, 2025) ("It is well-established that '[t]he more important the evidence, the less a plaintiff is justified for failure to disclose it and the more the opposing party would be prejudiced if the evidence were allowed.'" (quoting Intercollegiate Women's Lacrosse Coaches Ass'n v. Corrigan Sports Enters., Inc., 694 F. Supp. 3d 625, 653 (M.D.N.C. 2023))).

However, when an expert brings "experience or expertise to bear on hard numbers, those numbers have to be revealed. This allows the opponent to challenge what the expert did with those numbers." Paramount Media Grp., Inc. v. Vill. of Bellwood, 308 F.R.D. 162, 168 (N.D. Ill. 2015). Because Payne's rebuttal report's conclusion that rework costs were overstated "by roughly a factor of two" relies on undisclosed calculation of hard numbers, that portion of his conclusion must be excluded from Payne's testimony. See id. Specifically, Payne's rebuttal report fails to identify which Perini's pay application he considered or what calculations led him to determine

that Dungan mistakenly assumed Perini's costs were similarly limited and rework costs were overstated roughly by "a factor of two." Payne Rebuttal Report, at 36-37 (ECF No. 223-1, at 38-39). However, the rest of Payne's opinion in Section 3.5—including his opinion that Dungan substantially overstated rework costs—is supported by information Payne identified in his report, so Section 3.5 of the rebuttal report need not be wholly excluded.

## IV.    CONCLUSION

For the foregoing reasons, ZP's Motion to Exclude Testimony from Travelers' experts Sam Haagenson, Kieran O'Connor, and J. Mark Dungan, (ECF No. 228), IS GRANTED IN PART and DENIED IN PART; Travelers' Motion to Exclude Testimony from ZP's expert Christopher J. Payne, (ECF No. 222), is GRANTED IN PART and DENIED IN PART; and Travelers' Motion to Exclude Testimony from Section 3.5 of Payne's Rebuttal Report, (ECF No. 243), is GRANTED IN PART and DENIED IN PART.

IT IS SO ORDERED.

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
November 13, 2025